# Richmond

## DISMAL SWAMP RAILROAD COMPANY v. JOHN L. ROPER LUMBER COMPANY.

### March 13, 1913.

1. RAILROADS—*Foreclosure Sale—Rights of Purchaser.*—If the works and property of a railroad company possessing the power of eminent domain are sold under a deed of trust, and conveyance thereof is made to the purchaser, the purchaser, by express provisions of the statutes of this State, becomes a corporation by any name which may be set forth in the said conveyance, upon complying with the provisions of the statue, and as such succeeds to all the franchises, rights and privileges, and is liable for the performance of all the duties of its predecessor in title.

2. CORPORATIONS—*Forfeiture of Charter—How Enforced.*—A cause of forfeiture of the charter of a corporation, however great, cannot be taken advantage of or enforced against it, collaterally or incidentally, or in any other mode than by a direct proceeding for that purpose in behalf of the government.

3. RAILROADS—*Branch Road—Condemnation of Right of Way—Public Use—What Constitutes.*—If the use to be subserved by building a branch railroad is a public use, the fact that it enures to the advantage of a particular individual, or class of individuals, will not render the use any the less public. If the track is to be open to the public, to be used upon equal terms by all who may at any time have occasion to use it, so that all persons who have occasion to do so can demand that they be served without discrimination, not merely by permission, but as of right, and if the track is subject to governmental control, under general laws, as are the main lines of a railroad, then the use is·a public one, and the legislature may grant the power to exercise the right of eminent domain to a corporation which is to construct and operate such track; and, if the purpose of the railroad corporation in building any particular branch track is to operate the same in conformity with those requirements, then the power granted by the legislature may be exercised in that particular case. For a full discussion of what constitutes a public use, see opinion by Keith, P.

4. RAILROADS—*Ownership of Stock—Condemnation—Private Use.*—Although nearly all of the stock of a railroad company is owned by a private business corporation, and a proposed branch road will be chiefly beneficial to it, that fact does not make the corporation the owner of the railroad and its franchises and privileges, nor the taking of land for the extension of the railroad a taking of property for private use. No matter how many or how few own the stock of a railroad company, that corporation still continues to exist as a separate and independent corporation. It preserves its corporative existence. It operates its own road. It has its own officers and makes its own contracts, and is still liable for the due performance of its public duties.

Error to a judgment of the Circuit Court of Norfolk county in a condemnation proceeding. Judgment for the defendant. Petitioner assigns error.

*Reversed.*

The opinion states the case.

*Braxton & Eggleston* and *Starke, Venable & Starke,* for the plaintiff in error.

*J. G. Martin,* for the defendant in error.

KEITH, P., delivered the opinion of the court.

The Dismal Swamp Railroad Company filed its petition in the Circuit Court of Norfolk county for the purpose of condemning for its use certain lands of the John L. Roper Lumber Company. The proceedings seem to have followed the statutes in such case made and provided, and the John L. Roper Lumber Company appeared and answered the petition, denying that the Dismal Swamp Railroad Company is a corporation authorized to condemn land, and denying that the property sought to be condemned is necessary for the operation of the railroad, and that the use for

which the land of the lumber company is sought to be condemned is a public use, or any use for which condemnation is proper; and alleging that the railroad company is not a corporation engaged in any public service, but is in truth and fact a mere department or agency of the Richmond Cedar Works.

Upon these issues testimony was taken, and the circuit court being of opinion "that the said Dismal Swamp Railroad Company is not a public service carrier or corporation, or engaged in any public service, but is in truth and fact a mere agency or department of the Richmond Cedar Works, which Cedar Works is a large lumbering corporation, and that said Dismal Swamp Railroad Company handles the logs and timber of said Richmond Cedar Works in certain localities; that the use for which the land of said John L. Roper Lumber Company is sought to be condemned is not a public one, nor any use for which condemnation is proper * * * *" the petition of the Dismal Swamp Railroad Company was dismissed. Thereupon, it asked for and obtained a writ of error from this court.

The testimony adduced on the part of defendant in error tends to show that the railroad company's stock was owned by the same persons who owned the stock of the Richmond Cedar Works; that the Richmond Cedar Works acted as the financial agent of the railroad company in handling its funds and paying its debts; that the greater part of the freight hauled by the railroad company was the property of the Richmond Cedar Works; that the railroad company had only a very short line, did a small business, owned but little rolling stock, operated no proper passenger coaches, maintained no proper depots and station facilities, and filed no tariffs, as required by law. To the admission of this testimony the railroad company objected, upon the ground that the testimony merely tended to show a close

alliance between the railroad company and the Richmond Cedar Works, and was improper and irrelevant to any issue in the case. The circuit court overruled the objection and admitted the testimony.

There are several bills of exception embodying in principle the same questions; and they need not be more specifically adverted to.

The first question to be considered is whether or not the plaintiff in error is clothed with authority to institute proceedings for the condemnation of land for its use.

The Dismal Swamp Railroad Company is a successor of the Norfolk and Camden Railroad Company, which was chartered by the General Assembly of Virginia by an act approved February 2, 1892, and was given by said act "all the rights, powers and privileges conferred, and made subject to all regulations and general laws, applicable to bodies politic and corporate in the State of Virginia not inconsistent with this act." It was expressly authorized "to locate, construct, equip, maintain and operate a railroad from some suitable point on the southern branch of the Elizabeth river, in the county of Norfolk, Virginia, southwardly, by the most advantageous, expedient and practicable route, to some suitable and convenient point in the said county of Norfolk, on the boundary line between the State of Virginia and the State of North Carolina, or to such intermediate point as may be expedient." It was authorized to "build branch tracks of ten miles in length each, or less, through such routes as said company may deem necessary for the successful operation of its road," and "to cross at grade, over or under, intersect, join or unite its railroad with any other railroad now built or constructed, or hereafter to be built or constructed, at any point on its route, upon the grounds of such railroad company." It was authorized to acquire timber lands not to exceed 5,000 acres, to sell lumber, and to operate such mills

as were necessary to prepare such lumber for market, to receive subscriptions from individuals, other companies, associations or corporations. It was also expressly authorized by its charter "to acquire, by purchase, condemnation, or otherwise, the lands necessary for its tracks, or the right of way over such lands, and, in addition, may acquire such other lands, and hold the same, as are necessary for the proper conduct of its road."

The Norfolk and Camden Railroad was duly organized under its charter, and constructed and operated a railroad from a point on the southern branch of Elizabeth river to a point on the boundary line between Virginia and North Carolina, from which last-named point the road extended a considerable distance into North Carolina, under a charter from the last-named State. Under date of February 6, 1895, the Norfolk and Camden Railroad executed and delivered to G. Hatton, trustee, a mortgage upon all of its right of way, road beds, etc., as security for certain indebtedness of said company; and in the month of February, 1899, in the chancery cause of *Annie C. Smith* v. *Norfolk and Camden Railroad,* in the Hustings Court of the city of Portsmouth (to which last-named court that cause, which had been instituted in the Circuit Court of Norfolk county, had, on the 8th day of March, 1897, been removed by consent of parties) a sale was made by the said hustings court under said deed of all the property, rights, powers, privileges and franchises of the said Norfolk and Camden Railroad to Gustavus Milhiser and T. K. Parrish, their successors and assigns, under the name of the Dismal Swamp Railroad Company; and by reason of the premises the said purchasers, by virtue of the statute in such case made and provided, then and thereby became a corporation by the name of The Dismal Swamp Railroad Company, and then and thereby, as such corporation, succeeded to all the franchises, rights and privileges, and became com-

pellable to perform all the duties that would have been had, or should have been performed, by the said Norfolk and Camden Railroad Company but for such sale and conveyance. See secs. 1233 and 1234, Code; *Lake Drummond Canal Co.* v. *Com'th,* 103 Va. 337, 49 S. E. 506, 688 R. A. 92.

After the Dismal Swamp Railroad Company came into being and into possession of the property, rights, powers and franchises of the Norfolk and Camden Railroad, as aforesaid, it continued to operate its railroad, and is still operating the same, and with a view to extending and developing its road, so as to reach and serve more property and persons, it decided to build a branch line between five and six miles long, extending from a point on the existing line of said road westwardly to a point on or about the Dismal Swamp Canal, where it was contemplated that it would be connected with another road, which it would ultimately acquire in carrying out the company's plan to extend its road in that direction to the border of, and into, the State of North Carolina for many miles; that in order to construct this branch line it became necessary to acquire a small piece of land, amounting to some three or four acres, as a right of way for the proposed branch for a short distance through the lands of the John L. Roper Lumber Company, another corporation under the laws of the State of Virginia, and being unable to agree upon the consideration with the owners thereof, the condemnation proceedings were instituted.

On behalf of the railroad company there was testimony which tended to prove that the proposed branch line would extend to the east side of the Dismal Swamp Canal, across which it was proposed to build a steel bridge, and would pass through the village of Wallaceton, at which was located the Norva Land and Lumber Company, which company was donating a right of way; that the railroad company had agreed with said last-mentioned company to put

in a switch and sidetrack; that it proposed to put in switches at other points to accommodate the farmers along the road in the transportation of their farm products, and that it was in contemplation to put in stations on the proposed branch line, as required by law; that their purpose was to haul over the contemplated line any products that were offered, and that the construction of the switches and the contemplated prolongation of the line would open up and develop a considerable agricultural district, and "be a benefit to a great many people."

There was proof that the railroad company had hauled freight for persons other than the Richmond Cedar Works, and had hauled freight by whomsoever tendered, and no instance was shown in which it had ever refused to haul any freight, or to accept and carry any person offering to become a passenger.

The contention of plaintiff in error is, first, that having been created a corporation by the Commonwealth of Virginia, a cause of forfeiture of its charter cannot be taken advantage of collaterally or incidentally, but can be enforced only in a court of law by a direct proceeding against the corporation.

In *Pixley* v. *Roanoke Navigation Co.,* 75 Va. 320, certain citizens sought an injunction to restrain the navigation company from collecting tolls, on the ground that the company had failed to improve the streams as its charter prescribed, or to keep them in order. The bill was demurred to, and as a consequence, its allegations had to be taken as true. Judge Christian, delivering the opinion, said: "This results from the very nature of an act of incorporation. It is not a contract between the corporate body on the one hand and individuals, whose rights and interests may be affected by the exercise of its powers, on the other. It is a compact between the corporation and the government, from which they derive their powers. Indi-

viduals, therefore, cannot take it upon themselves, in the assertion of private rights, to insist on breaches of the contract of the corporation as a ground for resisting or denying the exercise of a corporate power. That can be done only by the government with which the contract was made, and in proceedings duly instituted against the corporation. \* \* \* It would be against public policy, and lead to confusion of rights, if corporate powers and privileges could be disputed and defeated by every person who might be aggrieved by their exercise. Therefore, it has been often held that a cause of forfeiture, however great, cannot be taken advantage of, or enforced against corporations, collaterally or incidentally, or in any other mode than by a direct proceeding for that object in behalf of the government." See *Newport News, &c., Co.* v. *Hampton, &c., Railroad Co.,* 103 Va. 807, 50 S. E. 266.

In *Zircle* v. *Southern Ry. Co.,* 102 Va. 17, 48 S. E. 802, 102 Am. St. Rep. 805, the railroad company sought to condemn land for the purpose of building a spur track, and the ground of objection was that the proceeding was to build a spur track for a private enterprise, the Manor Mills, whose output the railway company already handled, for the sole benefit and convenience of the owners of that property. In other words, that it was an attempt on the part of the railway company to condemn private property for private use, and was therefore without sanction of law. In the course of the opinion the court said: "While the agreement between the railway company and the mill company justifies the conclusion that the primary object in constructing the spur track was to reach that industry, it also appears that it was for the use of the railway company and third parties (the public who might choose to patronize the railway company) as well. The circumstance that the mill company agreed, in the first instance, to contribute a certain amount to the cost of constructing

the track, does not affect the legal aspect of the case. The contract stipulated that the sum so advanced was to be returned by the railway company, which was to become the absolute owner of the property. So that the transaction, in legal effect, amounted merely to a loan by the mill company to the railway company.

"The authorities practically speak with one voice to the effect that, if the use to be subserved is a public use, the fact that the branch road enures to the advantage of a particular individual, or class of individuals, will not render the use any the less public. Indeed, it is a matter of common observation that the possibility of reaching industrial enterprises along the proposed route of a railway is a legitimate and important factor in determining the question of location. * * * * The test whether a use is public or not may be determined by the fact that where the use is public a trust attaches to the subject condemned for the benefit of the public, of the enjoyment of which it cannot be deprived by the company without a reasonable excuse. And by the further fact that the State retains the power to regulate and control the franchises of the company and to prescribe the amount of charges and tolls which it shall be lawful for the company to exact for the transportation of passengers and freight.

"The legislature has expressly delegated to railway companies the power of eminent domain. In the exercise of that power they represent the sovereignty of the State, and decide, within certain limitations, what and how much land of the citizen they will condemn for their purposes. Within those limitations their discretion is practically absolute. * * *

"The reports abound with decisions to the effect that a railway, built for the purpose of reaching an industrial enterprise, is for a public use, and the company is entitled to exercise the power of eminent domain in acquiring prop-

erty necessary for its construction, provided the general public has the right to use it.  *  *  *·

"As remarked, the question of the necessity; propriety, or expediency of resorting to the exercise of the power of eminent domain, in the absence of constitutional provision to the contrary, is a legislative, and not a judicial question."

See also *Hairston* v. *Danville & Western Ry.,* 208 U. S. 598, 28 Sup. Ct. 331, 52 L. Ed. 637, where it was shown that the tobacco company agreed in writing to give to the railway company a part of the land over which the spur track was to be constructed, and to pay the cost of the remainder. The Supreme Court of the United States, affirming the judgment of this court, held that "The uses for which the track was desired are not the less public because the motive which dictated its location over this particular land was to reach a private industry, or because the proprietors of that industry contributed in any way to the cost."

In that case the Supreme Court cited, with approval, *Ulmer* v. *Lime Rock Co.,* 98 Maine 579, 57 Atl. 1001, 66 L. R. A. 387, which is so apposite to the case under consideration that we feel justified in an extensive quotation from it. "The mere fact," said the court, "that the primary purpose of such a branch is to accommodate a particular private business enterprise is by no means a controlling test. The character of the use, whether public or private, is determined by the extent of the right by the public to its use, and not by the extent to which that right is, or may be, exercised. If it is a public way in fact, it is not material that but few persons will enjoy it. When such a branch track is first constructed, and the right of way necessary therefor is taken, it may in fact be used only for the business of the plant to which it is constructed, because at that time no other business enterprise may exist in that

vicinity to furnish freight for transportation; but in the future other enterprises may spring up, either upon the line or upon the extension thereof, so that a branch track, which in the first instance is primarily constructed for the accommodation of one, may become of equal accommodation, benefit and use to others. * * *

"The tests decisive of this question, as to whether a branch track of this character is to be constructed and operated for public or private purposes, deducible from the great weight of authority upon the question in this country are these: If the track is to be open to the public, to be used upon equal terms by all who may at any time have occasion to use it, so that all persons who have occasion to do so can demand that they be served without discrimination, not merely by permission, but as of right, and if the track is subject to governmental control, under general laws, as are the main lines of a railroad, then the use is a public one, and the legislature may grant the power to exercise the right of eminent domain to a corporation which is to construct and operate such track; and, if the purpose of the railroad corporation in building any particular branch track is to operate the same in conformity with those requirements, then the power granted by the legislature may be exercised in that particular case. * * *

"Another cause of complaint, much relied upon in argument, and which appears in different forms of allegation throughout the bill, is that all of the stock of the railroad company is at the present time owned by the Rockland-Rockport Lime Company. It appears from the evidence that each of the directors of the railroad company is the owner of one share of its capital stock, and that all of the rest of the stock is owned by the lime company. It is argued from this that the lime company, a corporation organized purely for private purposes, with no duties to perform of a public nature, is in fact the owner of, and is

in possession and control of, the railroad, and of all the franchises and privileges that were granted by the legislature to the railroad company, and that as such owner it is operating and managing the same for the sole benefit of the lime company, to the exclusion of all others.

"But the argument is based upon a wrong assumption. Whoever may be the owner of the stock of the railroad company, or however many or few such owners there may be, that corporation still continues to exist as a separate and independent corporation. It preserves its corporate existence. It operates its own road. It has its own officers and makes its own contracts. Although the lime company is the owner of nearly all of its capital stock, that company does not thereby become the owner of the railroad company's road, franchise, or other property. * * *

"If, of course, the railroad company should unreasonably fail to perform the public duty for which it was chartered, and the management should make such discriminations as to clearly show an intention to exclude from the benefits of the road all persons and corporations, except the lime company, for the purpose of preventing any competition with the latter company, it might be sufficient to work a forfeiture of the franchise granted to the railroad company."

The facts of that case are so similar to the one under consideration that if the names were changed, substantial if not complete identity would be established.

In *De Camp* v. *Hibernia R. Co.,* 47 N. J. Law 43, it was said: "This enterprise does not lose the character of a public use because of the fact that the projected railroad is not a thoroughfare, and that its use may be limited by the circumstances to a comparatively small part of the public. Every one of the public having occasion to send material, implements, or machinery for mining purposes into, or obtain ores from, the several mining tracts adja-

cent to the location of this road, may use the railroad for that purpose, and of right may require the company to serve him in that respect; and that is the test which determines whether the use is public."

In *Kettle River R. Co.* v. *Eastern Railway Co.,* 41 Minn. 461, 43 N. W. 469, 6 L. R. A. 111, the court said: "If all the people have the right to use the road, it is a public use or interest, although the number who have business requiring its use may be very small."

In *Chicago Dock & Canal Co.* v. *Garrity,* 115 Ill. 155, 3 N. E. 448, the court said: "We have not regarded the circumstances that they were laid with private funds and that they terminated opposite or within convenient contiguity of a private manufacturing establishment as materially affecting them and giving a private character to their use. All termini of tracks and switches are more or less beneficial to private parties, but the public character of the use of the tracks is never affected by this. If they are open to the public use indiscriminately, and under the public control to the extent that railroad tracks generally are, they are tracks for public use. It may be in such cases that it is expected, or even that it is intended, that such tracks will be used almost entirely by the manufacturing establishment, yet, if there is no exclusion of an equal right of use by others, and this singleness of use is simply the result of location and convenience of access, it cannot affect the question."

In *Madera Ry. Co.* v. *Raymond Granite Co.* (Cal.), 87 Pac. 27, 3 Cal. App. 688, it is said that "Whether a way be public or private does not depend on the number of people who use it, but upon the fact that every one may lawfully use it who has occasion. * * * The public use required need not be of the whole State or any considerable portion of it, but the use and benefit must be in common, not to particular individuals. Every public use is, in more or

less degree, local, and benefits a particular section more than others. This is true of railroads as well as of ordinary highways. The cases are numerous sustaining this rule. * * *

"Neither the length of the road nor the fact that it is a branch or spur bears any necessary relation to the question of public use or of the public interest to be subserved by it, except possibly as a circumstance bearing upon the alleged fact that the road is solely for the private use of plaintiff. * * * Short roads as connecting links between independent railroad systems, or as branches and feeders to established systems, are often necessary, and fall within the general rules governing condemnation quite as completely as main lines of road. It is the public purpose that is to govern, and not the length of the road, whether it is a road connecting two established roads or a branch of an established road. * * *

"Some question arose in the case as to the right of the defendant company to inquire into the good faith of the promoters of plaintiff company in forming the corporation, and to show that it was in fact not a *bona fide* corporation * * * We do not think, however, that the good faith of the corporators in forming the corporation can be called in question collaterally in this proceeding so as to in any wise affect the validity of the corporate existence. The dissolution of the corporation, or the forfeiture of its franchise, can only be accomplished by *quo warranto* proceedings. * * * If the use be private, with which the public have no concern, and in which it has no interest, condemnation will be refused, regardless of the general right of the corporation to condemn by virtue of its corporate existence. * * *

"There was considerable evidence tending to the point that the main object in building the road was to enable the owners of the Madera Granite Company to market its

product. * * * The fact that the advantages of such road inures to a particular individual, or a class of individuals, will not render the use any the less public. And the fact that the stockholders of the Madera Granite Company were also stockholders of plaintiff company does not prove that the contemplated use is a private use."

In *Kansas Railway Co.* v. *Coal Co.*, 161 Mo. 288, 61 S. W. 684, 51 L. R. A. 936, 84 Am. St. Rep. 717, it is said: "There is nothing in the letter, or spirit, or policy of the law which prohibits the same persons from forming and conducting two different corporations—one a business and the other a railroad company. * * * The charter of the plaintiff and the laws of this State expressly require the plaintiff to transport persons and freight, and the plaintiff can be compelled by mandamus to do so if it refuses. The fact that almost the entire volume of business now in sight for the plaintiff to do will be transportation of coal produced by the Kansas and Texas Coal Company does not destroy the character of the plaintiff as a railroad company nor convert it into a private, and not a public, railroad; nor does it make the use to which the land sought to be condemned is to be applied any the less a railroad right of way, and therefore a public use."

In *Windsor Glass Co.* v. *Carnegie Co.*, 204 Pa. 459, 54 Atl. 329, it appeared that all the stockholders named in the articles of association were employees of the Carnegie Steel Company, Limited, which company was the real and beneficial owner of all the capital stock of the railroad. The court said: "The Union Railroad Company has not, and never had, any freight or passenger stations or depots, nor has it provided any place along the line of its road where passengers or freight may be received or discharged, excepting switches connecting with the property of the Carnegie Steel Company and a few others. It has no schedule or time-table of its trains, and no schedule of

rates, and is constructed on such grades that it cannot be reached by the public at any of the thoroughfares which it crosses. It has no passenger cars, and does not engage in the conveyance of passengers. From between 65 and 70 *per cent.* of the business done upon the road and its branches and leased lines is with the Carnegie Steel Company * * * nearly all of the remainder is the transfer of coal cars." And, continuing, the court in answer to the person whose land was sought to be condemned, said, *inter alia,* that the landowner's inquiry "is not into the rights conferred by the charter, but into the conduct of the defendants under it. Defendants obtained a charter, it is said, for a general railroad, but all the corporators were stockholders in a manufacturing company, and acted in the interests of the latter, not in good faith to build and operate a railroad, but merely to make an addition to their manufacturing plant. Similar efforts to go behind the rights expressed in the charter have been before this court heretofore. *Rudolph* v. *Pa., &c., R. Co.,* 166 Pa. 430, 31 Atl. 131, was a very similar case. A railroad had constructed a short branch to a village where there was a large iron works, and after the construction the branch was used altogether for the carrying of freight to and from those works. No other stations were provided, and no passenger cars. An owner whose land was crossed by the branch filed a bill on the same grounds as the present bill— that the branch was not in good faith a branch road authorized by the statute, but a private road for private benefit. It was held that the charter, showing the franchises to build a branch, was conclusive, the court saying that if there was bad faith 'the Commonwealth would be the proper party to complain.' * * *

"The further questions of good faith in obtaining the charter, or in acting under it, can only be raised by the Commonwealth. In the present case, as already said, the

real substance of the complaint is not that defandants are doing something that the charter does not authorize, but that they are not doing something the charter enjoins, to-wit, not furnishing passenger cars at all, and not furnishing stations or freight cars which the public can use as that have a right to use a public railroad. It is a conclusive reply that if the defendants should now provide stations, passenger and freight trains, time schedules, etc., there could be no question of the charter right to do so, and yet plaintiff's whole complaint would be swept away on the facts."

In *Wellsburg, &c., R. Co.* v. *Traction Co.,* 56 W. Va. 26, 48 S. E. 750, it is said: "The answer denies the right claimed  *  *  *  on the ground that the plaintiff is not, and will not be when completed, a common carrier, but a mere private coal road. To sustain this position the defendant relies upon the shortness of plaintiff's line; * * * the fact that the Wellsburg Coal Company, a corporation having for its stockholders the same persons who own the stock of the plaintiff railroad company, owns 1,000 acres of coal land through which the railroad will be constructed and operated." The court then refers to certain testimony offered to prove the public nature of the use for which the property was to be condemned, and proceeds: "This evidence is uncontradicted, and nothing tends toward its overthrow except the circumstances of ownership by the stockholders, by means of corporate organization, of the coal land, and its being the principal inducement to the investment in the railroad company. But they do not exclude the intent to operate a railroad as a common carrier. The several purposes of the corporation may consistently stand together. Other motives than the mere operation of a common carrier and other works of internal improvement always move the people who build them, else none would ever be constructed. They constitute fields of profit-

able investment, direct and indirect, and have a double character, which the law recognizes and upholds. For some purposes they are private, and for others public, and the private right which the stockholders and creditors have in respect to them constitute the sole inducement to their construction and operation."

In *Oregon Shore Line R. Co.* v. *Postal, &c. Co.,* 111 Fed. 844, 49 C. C. A. 665, the court, in upholding the right of a corporation to condemn land, said: "Its right to maintain the present suit is not abridged by the fact that the stock subscribed had not been paid for, and that the majority of the stock was owned by another corporation, which conducted its business and controlled its movements. \* \* \* The defendant in such a suit may deny that the plaintiff is duly incorporated, and may cast upon it the burden of proving its corporate existence, but, if the latter show that it is a corporation *de facto,* it is sufficient. The right to further contest its authority to condemn land, or to prosecute the objects of its organization, belongs only to the State."

In *Alabama Railroad Co.* v. *Cumberland, &c., Telegraph Co.,* 88 Miss. 445, 41 Southern 259, the Supreme Court of Mississippi said: "It is clear that the Mississippi Telegraph Company was duly and regularly incorporated under the laws of this State as a telegraph company, and under our statutes had the authority to exercise the right of eminent domain in this case. The sole objection to the exercise of that right by the Mississippi Telegraph Company, set up in the pleadings, is that it was but a dummy for the Cumberland Telephone Company, had no capital stock and was organized for the mere purpose of enabling the Cumberland Telephone Company to do indirectly what it could not directly do, and that its organization and incorporation were consequently unlawful; but whether the Mississippi Telegraph Company is a properly organized

company under the laws of this State is a question between it and the State, not to be inquired into in this proceeding by the appellant." See *Morrison* v. *Forman,* 177 Ill. 427, 53 N. E. 74; *Terre Haute, &c. R. Co.* v. *Robbins,* 27 Ill. 376, 93 N. E. 399.

In *Westport Stone Co.* v. *Thomas,* 175 Ind. 324, 94 N. E. 408, 35 L. R. A. 646, the Supreme Court of Indiana said: "It is not a question whether appellant is a private or public corporation, but whether the use is a public one. If it is to be so used, the right of condemnation can be bestowed upon any private corporation; but if not to be so used, it cannot be conferred upon either a private or a public corporation. * * * It is held, in *County of Randolph* v. *Post,* 93 U. S. 502 [23 L. Ed. 957], that a corporation with authority to 'construct, complete, and operate a railroad,' is not the less a railroad company because it is also a coal, or a mining, or a furnace, or a manufacturing company. * * * When appellant accepts and exercises the power of eminent domain, * * * it thereby impliedly agrees that said lateral railroad shall be open to the public to be used on equal terms by all who may at any time have occasion to use it, not merely by permission, but by right, even if the complaint in the condemnation proceeding were silent upon this subject."

To the same effect see *St. Louis R. Co.* v. *Petty,* 57 Ark. 359, 21 S. W. 885, 20 L. R. A. 434.

In *Chesapeake Stone Co.* v. *Moreland,* 126 Ky. 665, 104 S. W. 765, 16 L. R. A. 479, the Supreme Court of Kentucky said: "It is not the number of people who use the property taken under the law of eminent domain that constitutes the use of it a public one, nor does the fact that the benefits will be in a large measure local enter into the question. In short, according to the generally recognized rule, the length of the public way, the places between which it runs, or the number of people who use it, is not the essential in-

quiry. The controlling and decisive question is, have the public the right to its use upon the same terms as the person at whose instance the way was established? If they have, it is a public use; if they have not, it is a private one. If the owner can exercise the same kind of dominion over it as he does over other property owned by him, if he can close it up, if he can prohibit all, or any part, of the public from its use, then it is clear that its establishment would be private and not public; and the right of eminent domain could not be invoked in its creation."

In *Kettle River Co.* v. *Eastern Ry. Co.,* 41 Minn. 461, 43 N. W. 473, 6 L. R. A. 111, the Supreme Court of Minnesota holds the same doctrine. See also *Dotson* v. *Atchison, &c. R. Co.,* 81 Kans. 816, 106 Pac. 1047.

In *Butte, &c. Ry. Co.* v. *M. U. Ry. Co.,* 16 Mont. 504, 41 Pac. 232, 31 L. R. A. 298, 58 Am. St. Rep. 508, it was decided that "It is well established that if, in point of law, a use is public, the fact that not very many persons will enjoy the use is not material. * * * The character of a way, whether it is public or private, is determined by the extent of the right to use it, and not by the extent to which that right is exercised. If all the people have the right to use it, it is a public way, although the number who have occasion to exercise the right is very small. * * * The circumstance that the plaintiff road was built by a private corporation, and that its branches run within convenient contiguity of private mines or ore houses, does not materially affect the road and give a private character to its use or to the use of its spurs. All termini of tracks and switches are more or less beneficial to private parties, but the public character of the use of the tracks is never affected by this." *Chicago, &c., Co.* v. *Garrity, supra; Chicago, &c. R. Co.* v. *Naperville,* 169 Ill. 25, 48 N. E. 335.

.The doctrine of these cases is supported by Lewis on Em. Dom., sec. 161, who says that "It is not necessary that

the entire community, or any considerable portion of it, should directly participate in the benefits to be derived from the property taken."

*In Moore* v. *Sanford,* 151 Mass. 288, 24 N. E. 324, 7 L. R. A. 151, the Supreme Court of Massachusetts states the law as follows: "While the determination of the legislature is not conclusive that a purpose for which it directs property to be taken is a public use, it is conclusive, if the use is public, that a necessity exists which requires the property to be taken."

See also *Zircle* v. *Southern Ry. Co., supra.*

It appears from the record that the Dismal Swamp Railroad Company is a corporation clothed with the power of condemnation; that in the proceeding under consideration its purpose was to condemn land for a public use; and the authorities which we have cited conclusively show, first, that the corporate existence of the plaintiff in error cannot be called in question collaterally or incidentally by private parties, but that the forfeiture of its charter can only be enforced in a court of law by a direct proceeding against it; and secondly, that the facts which the testimony adduced by the defendant in error tended to prove, and which are enumerated at the beginning of this opinion, were immaterial and irrelevant to the issues to be decided.

From which it follows that the judgment of the circuit court must be reversed, and the cause remanded for further proceedings to be had not in conflict with this opinion.

*Reversed.*