# Richmond

HARRY L. LIGHT *v.* CITY OF DANVILLE.

March 11, 1937.

Present, Campbell, C. J., and Holt, Hudgins, Gregory,
Eggleston and Spratley, JJ.

The opinion states the case.

*Carter & Williams, R. E. Woolwine* and *Margaret L. Carter,* for the plaintiff in error.

*A. M. Aiken,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

The council of the city of Danville, a municipal corporation, adopted an ordinance on August 27, 1935, authorizing the construction of a hydro-electric plant and transmission lines for the city, and providing for the financing thereof subject to the approval of its qualified voters. The ordinance was approved by the mayor, and upon being submitted to the judge of the corporation court, a special election was, in accordance with law, ordered to be held for the purpose of submitting to the voters of the city the question whether the bonds in the principal sum of one million, five hundred thirteen thousand dollars, provided for in the ordinance, should be issued. The election was duly held, and a majority of the votes cast in the election being in favor of the bond issue, an order was duly entered by the judge of the court, showing such approval by an affirmative vote. The estimated cost of the plant was two million, seven hundred fifty thousand dollars. The aforesaid ordinance authorized the council to secure, by grant or loan, from the federal government the additional sum required under the provisions of either, or both, of the Acts of Congress known as the National Industrial Recovery Act (48 Stat. 195) and the Emergency Relief Appropriation Act of 1935 (15 U. S. C. A. § 728 note). It was found necessary for the construction of this plant to acquire many acres of land. Fifty-five per cent of the cost of the plant was raised and made available by revenue bonds of the city, and the remaining forty-five per cent was granted to the city by the United States government.

Among the parcels of land desired was a tract of thirty-nine acres in Patrick county, standing in the name of Harry L. Light of Washington, D. C. It is on a barren mountain side, not susceptible of cultivation, and without mineral or other valuable rights. It was planned to build roads and a pipe line to carry water from the dam to the power house over this land in connection with the development of the plant. The city was unable to come to terms with the owner as to the purchase price, and filed condemnation proceedings, with the result that he was awarded by the commissioners one hundred and fifty dollars, which award was confirmed by the court, and the amount deposited to the credit of the court by the city for the benefit of the owner.

The evidence discloses that the city of Danville owns and operates a steam electric generating plant about twenty years old, which has a normal expectancy of life of twenty-five years; that it has found it necessary in order to take care of its present and increasing needs to provide an increase of electric power; that the proposed new plant will only provide for the next ten years; that the city has been disposing of some of its surplus electric energy at a period of time when it does not need it, to its rural neighbors along its transmission lines, amounting to approximately five per cent of its production, which otherwise would go to waste; that the needs of the city and its inhabitants are such that this new development is required whether it has now, or will hereafter have, a single consumer outside of the city: that it was not proposed in the beginning, or now, to operate this plant except for the use and benefit of the city and its inhabitants; and that it expects to continue serving consumers outside of its limits so long as it has surplus energy, but that if it becomes necessary to protect its own inhabitants. it will cut off that service.

The city council accepted the offer of the United States to aid, by way of loan and grant, in financing the project, and entered into an agreement to abide by all the rules and regulations relating to such loan and grant as were made

a part of the contract, and as were contained in the rules and regulations which were a part of the government's offer.

The contract made with the Federal Emergency Administration of Public Works, under the Emergency Relief Appropriation Act of 1935, and according to the P. W. A. (Public Works Administration) circular made a part thereof, contained many provisions with reference both to the loan and grant, as well as to the construction of the plant. It contained provisions among others for the character of employment and labor preferences, for inspection by the Administrator and the Works Progress Administration, wages to be paid, materials to be furnished, and a submission by the city of construction reports, as well as the deposit of the moneys for the construction of the plant in a construction fund, to be expended therefrom upon the approval of some official of the Federal government. As a part of the contract, the city sold to the federal government the one million, five hundred thirteen thousand dollars of bonds authorized to be issued, and the remaining money required was a gift or grant from the federal government.

Work has begun upon the project. It is still progressing, and a very large sum has already been expended.

The caption, or title, of the ordinance of August 29, 1935, recited its purpose as "An ordinance to authorize the city of Danville to construct a hydro-electric plant and transmission lines for the city of Danville * * *."

Thereafter came the following recital and the first section of the ordinance, setting out the needs, objects and purposes:

"WHEREAS, the Committee of Citizens appointed to make a study of Danville's power problem has, upon the advice of Charles T. Main, Inc., Consulting Engineers, recommended a proposed hydro-electric development at the Pinnacles of the Dan; and,

"WHEREAS, the President of the United States has made an allotment of federal funds for the purpose,

"BE IT ORDAINED by the Council of the City of Danville as follows:

"Section 1. In order to enable the City of Danville to carry on more economically and adequately the undertaking of generating and supplying electric light and power to the City and its inhabitants, it is deemed expedient for the City to construct a new hydro-electric plant at the Pinnacles of the Dan and appropriate transmission lines, structures and facilities incidental thereto; to borrow, in aid of the financing thereof, $1,513,000.00, and to issue and sell its bonds in the principal amount of the money so borrowed. Accordingly, such construction and borrowing and the issuance and sale of such bonds are hereby authorized."

The next five sections of the ordinance deal with the issuance and sale of the bonds.

Then comes section 8, in the following language:

"Section 8. The new hydro-electric light and power plant and transmission lines shall be constructed for the use of the City, its inhabitants and customers; and the City shall agree with the holders of the bonds that it will maintain and operate such plant and transmission lines with the necessary distribution lines within the City as a municipally owned and operated public utility and that the City will take, use and distribute the current generated thereby and that it will charge reasonable and adequate rates for such current."

The remaining sections deal with matters connected with the revenue, the management of the plant, and a request for a special election for authority to issue bonds.

The public notice given of the special election on the question of issuing the bonds followed the language of the title of the ordinance. The city filed its petition instituting these proceedings on December 4, 1935. It alleged that the uses and purposes to which the land was to be put as a justification for its condemnation were: "That the City of Danville is to construct a hydro-electric plant at the Pinnacles of the Dan to be used as a municipal plant to serve its inhabitants with electric energy, under the authority of the laws of Virginia." The name and address filed with the petition alleged that "Harry L. Light, 3929 Huntington Avenue,

N. W., Washington, D. C." was the owner of the property sought to be condemned. No order of publication was had, but on December 5, 1935, Light was served with a copy of a notice that on December 18, 1935, the city would apply to the circuit court of Patrick county, Virginia, or to the judge thereof, for the appointment of commissioners of condemnation. Service of this notice was made on Light in the city of Washington, D. C., by a deputy United States marshall, and return made under oath in accordance with Virginia Code, section 6071.

Light appeared specially by counsel, and filed a motion to quash the notice and return thereon, in that there was no proper and lawful service, which motion was overruled. He then filed a demurrer to the petition for condemnation, assigning as grounds that the city of Danville by the terms of its charter, is limited to the ownership of land within said city, or within the county of Pittsylvania; that the city is without the power of eminent domain for the purpose set out in the petition because such a use is a private use, and not a public use; and that the petition failed to allege that the hydro-electric plant contemplated was for the exclusive use of the citizens of Danville. The demurrer was overruled; and thereupon Light filed an answer, a part of which was struck out by the court on motion of the city. The court denied the city's motion to strike out ground 5 of said answer, which is as follows:

"(5) Your respondent specifically asserts that the City of Danville now conducts a municipal electric plant for the purpose of serving not only its inhabitants but persons, firms, and corporations residing outside of the City of Danville and that said City of Danville does now serve persons, firms, and corporations residing outside of Danville with electric energy and that one of the purposes of the construction of the hydro-electric plant in question is to continue to furnish from said plant energy not only to the inhabitants of the City of Danville but to persons, firms, and corporations residing outside of the said city and that the condemnation pro-

ceedings in this cause *is* sought to be used for such purpose."

The court after hearing some evidence on the issue joined, adjourned the hearing. Light then asked leave to file an amendment to his answer. This amendment, in substance, alleged that the purpose and object of the city in constructing the plant mentioned, was to engage in the sale of electric energy not only to the inhabitants of the city, but to persons, firms, and corporations located without the city; that the city by its contract with the government had subjected itself to certain rules and regulations therein contained,whereby the United States would control all procedure to be taken with reference to the employment of labor and material, in the construction and erection of said plant, as well as control of all necessary expenditure of moneys; that the city had no right or power to delegate its discretion to the government; that the government had no right or power to aid the city in the construction of the plant by means of any gift whatsoever; that the State Corporation Commission has no regulation or supervision of municipal utilities; that the city does not engage in interstate commerce in the operation of its light and power plant; that under such circumstances the city is possessed of no power of eminent domain; that the property is sought and desired for a private use and not for a public use; and that the proceeding is an illegal and unlawful scheme in violation of the Constitution of Virginia and the Constitution of the United States.

On motion of the city, the court struck out this amended answer.

Evidence was then taken on the issue made up on ground 5 of the original answer. The trial court ruled against the appellant on this issue, and in its order held that the primary object of the condemnation of the said land was for the purpose of supplying power to the inhabitants of the city of Danville, and that the sale of surplus power outside of the city was merely incidental thereto. Commissioners were appointed. They subsequently heard evi-

dence, and on January 14, 1936, filed their report. The report fixed the sum of one hundred and fifty dollars as just compensation for the land proposed to be taken. To this report Light filed exceptions, and on March 10, 1936, an order was entered overruling the exceptions, confirming the report of the commissioners, and decreeing that the fee simple title to the property be vested in the city of Danville, upon deposit by the city of the sum of one hundred and fifty dollars in the Patrick County Bank, to the credit of the clerk of the Circuit Court of Patrick county, in this proceeding. Such deposit was accordingly made.

To this judgment, Light secured a writ of error, and in his petition for review he assigns the following six assignments of error:

That the trial court erred (1) in overruling the motion to quash the notice and return thereon, and erred in the appointment of the commissioners of condemnation without proper notice; (2) in overruling the demurrer to the petition for condemnation; (3) in striking out the amendment to the answer; (4) in ruling against petitioner on the issue raised by ground number 5 of the original answer; (5) in overruling exceptions to the report of the commissioners, and in confirming said report; and (6) in entering the order vesting a fee simple title in the city of Danville to the land described.

In support of his assignments of error, he relies upon the following legal propositions:

"(1) There was no proper and lawful service on your petitioner of the notice of application for the appointment of Commissioners.

"(2) The City of Danville has no power to acquire land in Patrick County for any purpose.

"(3) It is beyond the power of the City of Danville to construct the hydro-electric plant contemplated by its contract with the Government because the contract con-

stitutes an improper and unlawful attempt to delegate power and discretion.

"(4) The proposed construction of the hydro-electric plant at the Pinnacles of the Dan by the City of Danville is an unlawful scheme because it is intended to finance the same in great part by grant or gift of money from the Federal Government provided for by the National Industrial Recovery Act, which, in this respect, exceeds the constitutional powers of the Congress of the United States.

"(5) The City of Danville has no power of eminent domain to construct the plant here contemplated because it has asserted in the ordinance providing for same and the record shows in fact that at least in part the plant is to be constructed for a private use and purpose.

"(6) The City of Danville has no power of eminent domain to construct any hydro-electric plant because (a) it maintains and operates its power plant in its private or proprietary capacity; (b) the State of Virginia has not provided by existing law for the right of use by the public of municipally-owned utilities; (c) therefore, such use is private, not public."

By reason of the nature of the defenses, the questions raised here are novel in Virginia, and not a single case involving similar procedure, similar facts and similar defenses, has been cited from any court of last resort in America. For convenience and brevity, we will take up the questions raised out of order, and hereafter refer to them by number.

In the argument here and in the reply brief the plaintiff in error definitely abandoned the second of the above legal propositions. He admitted, in view of Virginia Code 1936, section 3031, and of chapters 26 and 31 of the Acts of the General Assembly 1933, Ex. Sess., that the city of Danville has the power to acquire land in Patrick county.

Upon considering the questions of law raised upon the third and fourth legal propositions, we are at once confronted with three questions. Do they constitute a defense to the

action of the city in exercising the power of eminent domain? Is it proper for such defenses to be pleaded in this proceeding? Has the defendant a justifiable interest in said defenses?

The power of eminent domain is a most important incident of the power of a sovereign. It is a high prerogative right, and there is no doubt about the power of the State to exercise it, or to delegate it to subordinate agencies to be exercised in proper proceedings for the public welfare. The statutes confirming the power are to be strictly construed, and the authority conferred thereby is required to be carefully exercised.

Both parties, plaintiff and defendant, are bound to follow the prescribed statutory procedure in the attempt to exercise the right and in the defense offered to oppose its exercise. The issues are limited, and consequently the defenses that may be raised are likewise limited. A defendant may attack on the grounds of lack of constitutional capacity to exercise the power. He may show that the statue conferring the power has not been strictly followed in procedure. He may show any fact tending to prove that the exercise of the power is unauthorized, that the land is not being taken for public use, or that he has not been allowed a just compensation ascertained according to law. 4 McQuillin on Mun. Corps., 3092.

On the other hand, a condemnation proceeding is not subject to collateral attack upon the question of the wisdom of the construction of a public improvement, or the means, or the manner in which such improvement is to be constructed, or the economic soundness of the proposition. The decision of such questions lies within the judgment of the agency proposing to enter into and effectuate the public purpose.

How the plant is to be constructed, through what constructural agencies, or by what agents and employees, and out of what funds the land and the plant shall be paid for, are not questions involved in the condemnation pro-

ceeding, either on the merits or the method of procedure. One has not the right to inquire into the good faith of the proceeding, if the purpose is clearly set out. The case is not to be decided by the purposes and plans that may be hidden in the minds of the agency undertaking to condemn for a public purpose, but by the validity of what is to be done and may be done as shown by the record in the proceedings. 20 Corpus Juris, Eminent Domain, 910; Ruling Case Law, Eminent Domain, 210; *Boyd* v. *Ritter Lumber Co.*, 119 Va. 348, 89 S. E. 273, L. R. A. 1917A, 94.

In this State a condemnee has been denied the right to raise the defense that the condemnor had no *de jure* existence, or lacked the necessary authority under its charter, or franchise, to undertake the public improvement for which the land was sold. *Dismal Swamp R. Co.* v. *Roper Lumber Co.*, 114 Va. 537, 77 S. E. 598, Ann. Cas. 1914C, 641, and cases there cited.

In addition, it may be said that the financial interest of the landowner is protected when he receives a just compensation for his land taken for a public use. Even as a taxpayer in the community, while he might be concerned with the raising of the money to pay for the improvement, he cannot seek relief from such taxation in the condemnation proceeding. When the right of the condemnor to exercise the power of eminent domain is made out satisfactorily, the courts cannot deny it for any extraneous reasons which do not touch the real merits of the case. It is no defense that the city has no money to pay for the land taken, or that it will incur an indebtedness beyond its ability to pay.

In support of legal propositions three and four, plaintiff in error cites a number of cases, chiefly from the lower federal courts. The opinions of the federal judges on the two questions involved are as widely varied and as contradictory as are the two political theories of thought in connection therewith. They are as old as the Federal Constitution, and, perhaps, never in the history of this country have

been brought so prominently to the public mind as now. They involve the old controversy between Alexander Hamilton and James Madison, and between Mr. Story and Mr. Tucker in their respective commentaries on the Constitution, whether the welfare clause of the Constitution should be construed to enlarge the powers of Congress in the levying of taxes and the spending of public money, or should be limited to a strict construction as specifically enumerated therein. We shall not inquire into these economic or political theories, or the grounds of necessity or expediency upon which they are founded.

The questions are collateral to this proceeding, and do not affect the capacity to condemn, the right to condemn, the procedure of condemnation, or the nature of the use to which the property is to be put. They relate to the manner of raising the money, and the manner and means of constructing the plant. They invoke constitutional questions relative to such manner and means, and not constitutional questions relative to the exercise of the power of eminent domain.

In the cases cited by plaintiff in error, too numerous to be mentioned here, it may be observed that not a single case is cited in point where such defenses are made in a condemnation proceeding, but that almost invariably the proceedings were in equity, where either a taxpayer, or a competitor of the public improvement, sought a restraining order. For the purpose of the instant case, as we view it, there is no necessity for a judicial determination of the legal effect of the facts raised on the questions contained in the third and fourth propositions. Such defenses are irrelevant and immaterial in this condemnation proceeding, and do not herein constitute proper defenses.

We will next consider the first assignment of error as to whether there was proper and lawful service on the landowner of the notice of application for the appointment of commissioners. The record shows that when the city sought to secure this land, it undertook to get in touch with

Light, the owner. Some correspondence was had with his attorney in Washington, D. C., and through the attorney an offer made for the purchase was refused. Being unable to agree upon a purchase price, the city filed its petition, and gave therein the name and address of the tenant of the freehold as Harry L. Light, Washington, D. C. Thereupon service of a proper notice of the proceedings was made, in person, on Light, with a return thereon in due form, under Code, section 6071.

Light did not, in his own proper person, attend the trial. A special appearance was noted by his counsel for the sole purpose of moving to quash the service of process on the ground that personal service on a non-resident cannot be taken to be in lieu of the publication required by Code, section 4365. This motion being overruled, he duly excepted, and the case proceeded to trial upon its merits. Through able and competent counsel, he subsequently made every defense to the merits which he could have made under a general appearance.

Code, section 4365, in the chapter relating to "Eminent Domain," provides in the last two sentences as follows:

"If such tenant be a non-resident of this state or cannot with reasonable diligence be found therein or if it appears by affidavit that his residence is unknown, he may be proceeded against by an order of publication, which order, however, need not be published more than once a week for two successive weeks and shall be posted not less than ten days previous to such application. The publication shall in other respects conform to sections 6043, 6069, 6070."

It will be observed that the only change with reference to the usual order of publication is as to the length of time for which it must be published and posted.

A service of a process or notice in a legal proceeding may be had on the person or persons affected thereby, either actually or constructively, or by publication. The general law also makes provision for personal service of process or notice on non-residents, and prescribes the

effect thereof. Code, section 6071, in the chapter entitled, "Process, and the Order of Publication," reads: " * * * Personal service of the summons, *scire facias*, or notice, may be made by any person not a party to or otherwise interested in the subject matter in controversy, on a non-resident defendant out of this State, which service shall have the same effect, and no other, as an order of publication duly executed, * * * ."

We find no conflict between sections 4365 and 6071. Under the latter section, the general law simply provides an alternate or substitute means to accomplish the purpose of the notice intended to be given by an order of publication.

The sole function of a notice, or an order of publication, is to give information of its contents to the person to whom it is directed. When such a notice has been received through personal service of the process, the full intendment of the law has been effected, and effected in a manner that makes it certain that the interested party has received knowledge of the proceeding, while actual notice may never come to such party through an order of publication.

It is obvious, we think, that the personal service of the notice under section 6071 makes such notice not only equivalent to an order of publication duly executed, but gives to the receiver of the notice the advantage and benefit of actual knowledge which he might not otherwise receive.

Counsel for plaintiff in error admits, in his argument before us, that to sustain his exception to the sufficiency of the service of the notice would do nothing but delay the final decision herein, and perhaps save some court costs to his client.

The fifth assignment of error is that the city of Danville has no power of emminent domain to construct the contemplated plant, because a phrase in the ordinance providing therefor shows that at least in part the plant is to be constructed for private purposes.

The Virginia cases approve in substance the following definition of eminent domain: "Eminent domain is the right of the nation or the State or of those to whom the power has been lawfully delegated to condemn private property for public use, and to appropriate the ownership and possession of such property for such use upon paying the owner a due compensation to be ascertained according to law." 20 Corpus Juris, p. 513.

The great difficulty arises over the diversity of opinion as to what constitutes such public use as will justify the exercise of the power. We have no difficulty in holding that private property cannot be taken for private use. It has not been necessary to insert such a provision in our Constitution as the exercise of such a power in transferring the property of one to another without consent is contrary to the fundamental principles of our government. The great weight of authority holds that the term "public use" under the law of eminent domain means that there must be a right on the part of the public, or some portion of it, or some public agency, to use the property after it is condemned, and the right to the use must exist as a matter of right and not a favor. Justice Campbell said in *Nichols* v. *Central Virginia P. Co.*, 143 Va. 405, 130 S. E. 764, 767, 44 A. L. R. 727, in approving the able and comprehensive opinion of Judge Cardwell in *Fallsburg, etc., Co.* v. *Alexander*, 101 Va. 98, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855:

"A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner. The public interest must dominate the private gain."

The Virginia cases have consistently adopted the above theory of construction. *Miller* v. *Pulaski* (two cases) 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 552, and 114 Va.

85, 75 S. E. 767; *Jeter* v. *Vinton-Roanoke Water Co.,* 114 Va. 769, 76 S. E. 921, 926, Ann. Cas. 1914 C, 1029; *Norfolk County Water Co.* v. *Wood,* 116 Va. 142, 81 S. E. 19; *Boyd* v. *Ritter Lumber Co., supra; Nichols* v. *Central Virginia P. Co.,* 143 Va. 405, 130 S. E. 764, 44 A. L. R. 727; *Dismal Swamp R. Co.* v. *Roper Lumber Co., supra.*

Appellant relies upon the following words found in section 8 of the ordinance: "The new hydro-electric light and power plant and transmission lines shall be constructed for the use of the city, its inhabitants and customers * * *." He contends that the words "and customers" apply to persons who may receive electric energy residing outside of the city. That to supply electric energy to persons other than its own inhabitants constitutes a private use and not a public use, and that the power of eminent domain cannot be exercised for such a use.

The petition upon which this proceeding is based, and to which we look for an allegation of the objects and purposes, clearly and distinctly recites that the electric plant is to be constructed for the benefit of "the city and its inhabitants." The first section of the ordinance, *supra*, dealing with the objects and needs of the city specifically sets out the purposes of the undertaking in clear and unambiguous terms. The evidence fully sustains such objects and aims as being the primary and dominant purpose. Nor are the provisions of section 8 of the ordinance in conflict therewith.

The two words "inhabitants" and "customers" are here used together and should be considered together and in connection with the stated objects and purposes of this proceeding. A customer is one who makes use of the city's product, while an inhabitant may not be a customer. In this sense the use of both words covers those who will get the benefit of the objects proposed while the sole word "customers" simply specifies an important group that comes within the classification of inhabitants. The primary and dominant purpose being to serve the city and its inhabitants,

such city and its inhabitants are its prospective customers,—its principal and substantial customers. There is no reference in the ordinance or petition to customers outside of the city. Nor does section 8 of the ordinance read "other customers, or customers outside of the city." Whether contained in the ordinance or omitted, the word "customers" is unnecessary in order to include service to inhabitants of the city, or to provide an incidental service along its lines of transmission outside of the city. Even if it be construed to include an incidental service such as the record shows is now being rendered by the city, that would not destroy nor vitiate the dominant purpose of this proceeding. The word "customers" may, therefore, be readily disregarded as surplusage. There is nothing in the record that indicates that the city intends or proposes to go beyond the limits of the authority conferred on it, other than to furnish merely an incidental service beyond the city limits to those along its necessary lines of transmission. Nor is there anything in the record, or in this opinion, which will warrant or authorize the city to extend its service beyond such incidental use.

It is a known fact that wherever municipal plants of this nature have been established, some service has been rendered to customers outside of the city, so that even if the word "customers" implies users of electric current without the city, it is but a recognition of existing conditions and practices. As a practical matter, no such plant is constructed exactly fitted to the present needs of a city and its inhabitants. Men of wisdom look towards future needs, and require such plants to be constructed of sufficient capacity to take care of not only present needs, but reasonably expected future needs. If an electric plant were built to fit exactly the needs of a city at the time of its completion, in a short time it might be found to be inadequate, and it needs no argument to prove the necessity of looking ahead. The result is that with the completion of a new plant, there is a period when there is surplus energy and power created, which would go to utter waste unless utilized. This would

be true as to waste also if the population and business of a city declined.

It would, therefore, be unreasonable to hold that the surplus energy thereby created should be denied others in the community, separated only from the city by an invisible geographical or political line, who are willing to take it and pay for it. Such service is not forced on them. At the same time that it promotes their personal convenience and business interests, it results in a benefit to the city, its inhabitants and customers, in lessening the cost per unit. Many reasons could be added for the desirability and practicability of this service and all the reasons lead to the same inevitable conclusion. Such outside service is regarded as so essential, so economical, so practical, business-like and logical, that it has been approved by this court. Justice Holt, with reference to the custom of disposing of surplus water power by a municipal corporation, in the case of *Mt. Jackson v. Nelson* (1928), 151 Va. 396, 145 S. E. 355, 357, after reviewing many cases and authorities, said:

"Common sense requires us to hold that a city in the possession of surplus water, lawfully acquired, should not permit it to run to waste when it can be sold at a profit.

   *    *    *    *    *    *    *    *    *

"It is a common custom for municipal corporations in Virginia to furnish water to those who live beyond their limits. This is a source of profit to them, contributes to the sanitation of the outlying districts, and indirectly to that of the towns themselves. To discontinue this would, in many instances, be disastrous, and would result in the injury of all concerned without corresponding benefit of any kind to anybody. When to sell and when not to sell must be left, as other matters of business are left, to their sound judgment."

It is easy to apply the principles applied in the above case in the sale of surplus water power to this case involving the sale of electric light and power. Just as the furnishing of water is a contribution to the sanitation, convenience

and health of those who live in outlying districts, so electricity, in many cases, adds to the convenience and comfort of domestic living, and provides additional safeguards in the matter of fire and police protection.

In *Holmes* v. *City of Fayetteville* (1929), 197 N. C. 740, 150 S. E. 624, 626, the Supreme Court of North Carolina said:

"The powers of a municipal corporation are those granted in express words, those necessarily or fairly implied in, or incident to, the powers expressly granted, and those essential to the declared objects and purposes of the corporation.

\* \* \* \* \* \* \* \* \*

"The general rule is that a municipal corporation has no extraterritorial powers; but the rule is not without exceptions. The legislature has undoubted authority to confer upon cities and towns jurisdiction for sanitary and police purposes in territory contiguous to the corporation \* \* \*. If a municipality owns and operates a water or lighting plant and has an excess of water or electricity beyond the requirements of the public, which is available for disposal, it may make a sale of such excess to outside consumers as an incident to the proper exercise of its legitimate powers. (Citing cases and authorities).

\* \* \* \* \* \* \* \* \*

"\* \* \* A municipality furnishing water or light service renders service for a public purpose and the fact that the water or service is furnished for individual consumption or the use of the inhabitants does not detract from the public service. Private purposes may be served incidentally, but this does not destroy the public character of the corporation or municipality."

Defendant relies upon *Miller* v. *Pulaski*, 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 552, *supra*. In that case the town sought, when an Act of the General Assembly of 1906 (chapter 262) amended its charter, to condemn land in Carroll County for the enlargement and improvement of

its electric plant. The section upon which it acted provided, in part, that such improvements were "for the purposes of supplying the inhabitants of said town, or other persons, companies or corporations with water, electric lights or power; * * *." There is nothing in the opinion in that case to show that any distinction was made between supplying the inhabitants of the town and other persons, or that the primary object of the proceeding was to supply the town and its inhabitants. The court there held that in the provisions of the amendment to the charter there was such a combination of public and private use that since the two could not be separated, the act was unconstitutional.

In the instant case, the line of demarcation between private benefit and public use is clearly set out in the nature, character, and extent of service proposed to be rendered by the city of Danville.

We again quote from Justice Campbell (now Chief Justice) in *Nichols* v. *Central Virginia P. Co., supra:*

"It is difficult at times to observe the line of demarcation between private benefit and public use. When the two are thus so blended, 'the judicial practice in such cases is to approve the undertaking if it is capable of furthering a public use, and disregard the private benefit as a mere incident.'"

It is well to remember also that at the time of the institution of that proceeding, neither the general law nor section 1038 of the Code of 1887 gave to the town the power to acquire a public utility by condemning property for that purpose. After the amendment of section 1038 by an Act of the General Assembly in 1908 (chapter 349), the general law provided such power, and thereupon the town of Pulaski brought new proceedings in condemnation, and the proceedings were sustained and the condemnation allowed. *Miller* v. *Pulaski,* 114 Va. 85, 75 S. E. 767, *supra.* In the second case it was contended that the town did not have the right to condemn under its charter or any general statute, but the court held directly that it did have such power after the amendment to Code 1887, section 1038. That sec-

tion is now section 3031 of the Code of 1936, and reads as follows:

"The council of every city and town shall have power to acquire or otherwise obtain control of or establish, maintain, operate, extend and enlarge water works, gas works, electric plants, and other public utilities within or without the limits of said city or town; to acquire within or without the limits of the city or town by purchase, condemnation or otherwise, whatever land may be necessary for acquiring, locating, establishing, maintaining, operating, extending or enlarging said water works, gas works, electric plants, and other public utilities * * *."

In addition to this statute, the General Assembly of Virginia, in order to permit counties, cities and towns to secure the benefit of the National Industrial Recovery Act of 1933, and other Federal acts, further approved and supplemented the powers conferred by section 3031 in chapters 26 and 31 of the Acts of 1933, Ex. Sess. Chapter 26 provided:

"2. The cities and towns in this Commonwealth shall have power and are hereby authorized:

\* \* \* \* \* \* \* \* \*

"(e) To acquire by purchase, gift or the exercise of the power of eminent domain and to hold and dispose of, any real or personal property, or interest therein, in connection with any project, * * *.

"(f) To acquire by purchase, gift or by the exercise of the power of eminent domain and to construct, reconstruct, replace, repair, operate, maintain, embelish, develop, better or improve any project; and to perform any such acts and to do any such things under, through, or by means of its own officers, agents and employees, or by contracts with private corporations, firms or individuals.

\* \* \* \* \* \* \* \* \*

"12. In so far as the provisions of this act are inconsistent with the provisions of any other law, the provisions of this act shall be controlling. The powers conferred by this

act shall be in addition and supplemental to the powers conferred by any other law; * * *."

Chapter 31 provided for the removal of any provisions in the charters of cities and towns which would prevent compliance with the National Industrial Recovery Act, with regard to public works projects.

It will be further noted that Code, section 3031, was amended again in the revision of 1919, and a proviso attached to the 1908 amendment, that no property should be condemned for the purpose specified therein unless the necessity therefor should be shown to exist to the satisfaction of the court, was omitted. This court has consistently held that whether a condemnation is for a public or a private use, it is a judicial question and is subject to the review of the courts. *State Highway Com'r* v. *Kreger*, 128 Va. 203, 105 S. E. 217; *Nichols* v. *Central Virginia P. Co.*, *supra*.

Neither the Constitution of Virginia, nor statutes enacted pursuant thereto, confer upon cities the right or power to engage in private business enterprises. As subordinate to and as the agent of the State, cities have only such powers as are set out in their charters, and as are enumerated in the statutes. The fact that cities are permitted by the general law to acquire a public utility carries the direct implication that as a public agency it shall be held and used for the public welfare. It would be unreasonable to deny to the city the exercise of such a public service in behalf of its citizens merely because in rendering that service it may incidentally, and to its own advantage, be helpful to others of the public than those to whom it is directly obligated. Dillon on Mun. Corp. (5th Ed.) sec. 1300.

In *Jeter* v. *Vinton-Roanoke Water Co.* (1913), *supra*, this court approved the following quotation from Cooley's Const. Limitations:

"The reason of the case and the settled practice of free governments must be our guides in determining what is or what is not to be regarded as a public use; and that only can be considered such where the government is supplying

its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare, which, on account of their peculiar character and the difficulty, perhaps impossibility, of making provision for them otherwise, it is alike proper, useful and needful for the government to provide."

The sixth legal proposition involves a novel and ingenious reasoning. The plaintiff in error asserts it in the form of a syllogism. He says that since the city of Danville will maintain and operate its hydro-electric plant in its private or proprietary capacity, and that since the State has not provided for the right of use by the public of such municipally owned utility, the use thereof by the public will be private, and hence the city has no power of eminent domain.

Neither of the above-assigned premises bears any specific relation to the other, and they will be discussed separately.

As a general rule, it is true that a municipality acts and contracts in connection with the construction or operation of its municipal utility in its proprietary or individual capacity rather than in its legislative or governmental capacity, and is governed, for the most part, by the same rules that control a private individual or business corporation. *Mt. Jackson* v. *Nelson, supra;* 4 McQuillin Mun. Corp., p. 3860; 19 R. C. L. 788, sec. 95.

An examination of the numerous authorities cited to maintain the principle that the city maintains and operates a' public utility in its private or proprietary capacity, reveals that they deal with the rights, duties and liabilities of the city in connection with the construction and operation thereof rather than with the right of the public to the use thereof. The test of public use is not based upon the function or capacity in which, or by which, the use is furnished. The right of the public to receive and enjoy the benefit of the use is the determining factor whether the use is public or private. We have already defined the term "public use" in connection with the preceding assign-

ment of error. Such definition nowhere includes in its terms a requirement that the capacity in which, or by which, the use is rendered to the public is to be taken into consideration. A public use may exist where the owner constructs and operates a plant in a private or proprietary capacity. Thus a public service corporation constructs and operates its plant in its private or proprietary capacity, and yet the property is subject to the public use. The rights of the public to the use of the utility and the responsibility of the owner thereof for ministerial conduct in the operation of the utility are determined under different rules and standards. Different principles of law apply in the attempted enforcement of the separate responsibilities. This distinction between the capacities is designed to prevent a city from relying on the exemption possessed for governmental functions.

From the briefs and argument, it is evidently meant, by the second ground, to contend that since no statute has been enacted placing the operation of a municipally-owned public utility under the control and regulation of a State agency as to service and rates, there is no public use reserved.

It is true that Code, section 3716 (as amended by Acts 1932, ch. 244), confers general powers on the State Corporation Commission to control public service corporations, and that Code, section 4067 (as amended by Acts 1922, ch. 511), specifically excludes municipalities from the operation of such control. The wisdom of this lies with the legislature. However, the reason is apparent. Public service corporations are granted specific powers and privileges not possessed by individuals, and are organized for private gain and profit. It is unnecessary to add reasons here why there should be a State control over such corporations as to rates and service in consideration of the powers and privileges granted.

On the other hand, a municipality is a subordinate agency of the State. Like the State, it is created and organized to administer for the good of the people and to be regulated by their will. A municipally-owned public utility is held in trust for the common use and benefit of all

the people in the city. It, and the property it holds, is subject at all times to the general laws of the State. The residents of the municipality, by qualifying themselves as voters, may determine the political and business policy and management of the city. Thus both the State and the residents of the city have a voice in the conduct of its affairs. Every citizen may, by appropriate legal action, require the city to furnish a uniform character of service, with uniform rates in accordance with the several classifications of service. The utility, since it belongs to the public, must be managed and operated without favor or discrimination for such public. In these respects, a municipally-owned public utility is devoted to furnishing the general public of the city with a definite and fixed use in the property, which cannot be legally gainsaid or denied.

If plaintiff in error means, by the second ground, to maintain that because surplus electric energy is sold to non-residents of the city without control of rates or regulations by the State Corporation Commission or similar agency, the answer to such contention in this case is contained in the holding herein, that when such practice is merely incidental to the primary purpose as shown here, the primary purpose will determine the nature of the use. If the primary and dominant purpose has a direct reference to the public service and public use, and the incidental use tends directly to promote such purpose, then the dominant purpose must control.

While plaintiff in error admits that Code, section 3031, and chapter 26 of the Acts of 1933, Ex. Sess., confer in direct and positive language the power of eminent domain upon the city of Danville for such purposes as it has sought herein to exercise, he contends that both acts are unconstitutional. He admits that the case of *Miller* v. *Pulaski*, 114 Va. 85, 75 S. E. 767, *supra*, is definitely against his contention. He asks the court to overrule its decision in that case. Since that case, there have been before this court two other cases in which a public agency sought to exercise

the power of eminent domain. In *School Board* v. *Alexander*, 126 Va. 407, 101 S. E. 349, the court held that there could be no doubt that the use of property for school purposes is a public use. In *State Highway Com'r* v. *Kreger, supra,* the court held that there was no question but that the use was a public one where land was sought to be condemned to be used for a road. In neither of these cases was there denied the power of eminent domain to a governmental agency because of constitutional limitations, or because of a failure to designate a regulation of the use thereof by a State agency. It was recognized that the public agency itself possessed the power of regulation.

Modern practice, modern needs and modern economical necessities have justified legislation conferring the exercise of the power of eminent domain on governmental agencies for the benefit of the public. While it is not the function of the judiciary to inquire into the economic necessity for legislation, it has the duty of giving approval to such legislation when not barred by constitutional limitations. We are in accord with the reasoning and ruling of *Miller* v. *Pulaski*, 114 Va. 85, 75 S. E. 767, *supra,* since followed in succeeding cases in Virginia, approving the right of governmental agencies to construct, own and operate public utilities for the public good.

There is no merit in the assignment that the award for the property was inadequate. We do not find that the appellant insists upon this point either in the oral argument or in his brief filed herein.

Neither in the authority conferred on the city of Danville to exercise the power of eminent domain, nor in the procedure followed here, do we discover any conflict with those provisions of the Constitutions of Virginia (section 58) and of the United States (Amendment 14) which prohibit the taking of private property for public use without just compensation.

We are of opinion that the city of Danville has the power of eminent domain to construct a hydro-elec-

tric plant; that the record shows that the statutory procedure has been correctly followed; that the land sought to be condemned is to be taken for a public use for the city of Danville and its inhabitants; that the incidental sale of surplus electric energy to non-residents of the city does not destroy the primary and dominant object and purpose of the public use; and that the rulings and judgment of the learned judge of the trial court were based upon a correct interpretation of the law and the evidence, and will be affirmed.

*Affirmed.*

CAMPBELL, C. J., dissenting:

I am unable to agree with the conclusion reached in this case for the very good reason apparent on the face of the record, to-wit: it permits the taking of private property for a private use.

Section 8 of the city ordinance needs no construction. It is as plain as the English language can make it. The purpose for which this plant is to be erected, is set forth as follows:

"The new hydro-electric light and power plant and transmission lines shall be constructed for the use of the city, its inhabitants and *customers.* (Italics added.)

In view of the admissions and contentions of counsel for the city upon the argument of the case, we conclude that the insertion of the word "customers" was not an accident.

Counsel admitted that the city was now selling electric power to its customers, residing in the adjoining county of Halifax, and contended that under the grant to supply customers the city had the right to supply power to any community within the Commonwealth.

The test of the constitutionality of a statute is not what has been done, but what may be done. *Richmond* v. *Carneal*, 129 Va. 388, 106 S. E. 403, 14 A. L. R. 1341.

If we can judge the future by the past, it is conceivable

that the city of Danville may decide to supply its inhabitants power generated at its present plant, and supply its *customers* throughout the State with power generated at its proposed plant. He would, indeed, be a bold man who would assert that in the latter case the use was public.

In *Nichols* v. *Central Virginia P. Co.*, 143 Va. 405, 130 S. E. 764, 767, 44 A. L. R. 727, it is said:

" 'A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied, or withdrawn, by the owner. The public interest must dominate the private gain.' "

Under the law, the city of Danville is absolved from supervision by the State Corporation Commission, and can fix its own rates. If the proposed customer resides in Halifax county, he must take the service at the rate fixed by the city, and he must run the risk of being denied service whenever it pleases the representative of the city. That being true, of course the use as to the customer is private and not public.

It is unquestionably true that a municipality has the power to establish an electric plant within or without its corporate limits, and may for that purpose condemn necessary lands. It is likewise true that excess power may be sold to the residents of an urban community, but when power is thus sold, it is justified on the ground that it is merely incidental, and not an integral part of the output of the plant.

The question herein involved is not a new one.

In *Miller* v. *Pulaski*, 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 552, it appears that the city undertook to establish a hydro-electric plant. The General Assembly, Acts 1906, p. 460, ch. 262, amended the charter of the town of Pulaski. As amended, the town was given authority, "To establish, improve, or enlarge water works and electric light works,

or gas works, or to construct and equip and operate new electric light plants or water works, electric wires, poles, pipes, and other appurtenances to said plants within or without the corporate limits of said town for the purpose of supplying the inhabitants of said town, or other persons, companies or corporations with water, electric lights or power; * * *."

This court, speaking through Keith, President, said:

"The act before us embraces an object which is constitutional and one which is unconstitutional, and they are so united as, in our judgment, to be inseparable. We cannot suppress the grant of the power to condemn for private purposes and maintain the act so far as it authorizes a condemnation for a public use, * * *."

This case was reversed because Pulaski was given the power to condemn for the purpose of supplying light, etc., to "other persons, companies or corporations." Danville is given a still more comprehensive right.

It is true that Pulaski was afterwards given the power to condemn. *Miller* v. *Pulaski*, 114 Va. 85, 75 S. E. 767. But it was not until these objectionable powers had been stricken out by an act of the Legislature.

I believe in progress and likewise in the application of the rules of common sense to the solution of economic problems, but we should not in the name of progress, nullify the fundamental law.

HOLT, J., concurs in dissent.