# Richmond

## W. R. MUMPOWER V. HOUSING AUTHORITY OF THE CITY OF BRISTOL AND CITY OF BRISTOL.

November 26, 1940.

Record No. 2345.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston and Spratley, JJ.

428

The opinion states the case.

*Jones & Woodward,* for the plaintiff in error.

*Donald T. Stant, Bradley Roberts* and *Floyd H. Roberts,* for the defendants in error.

CAMPBELL, C. J., delivered the opinion of the court.

The opinion of the trial judge, Honorable Joseph L. Cantwell, Jr., sufficiently states the issues involved in this litigation and the reasons which support the decree. It follows:

"Complainant, who alleges that he is a citizen, resident, taxpayer and property owner of the City of Bristol, Va., files his bill herein, assailing the organization of the Housing Authority of the City of Bristol, and questioning its right to carry out its functions in general. Specifically, the bill challenges the right of said Authority to issue bonds, the right of the City Council, by its resolution or ordinance, to authorize the Mayor to appoint members of the Authority, the action of the Mayor in making such appointments, the organization of the Authority, the authority to enter into and the validity of the cooperation agreement between the Authority and the City, the legality and validity of the two contracts between the Bristol Authority and the U. S. H. A. and the legality and validity of the contract between the Bristol Authority and V. L. Nicholson Co., copies of all of the contracts except the last being exhibited with the bill, and asks a declaratory judgment as to the validity of the entire 'Housing Authorities Law' (Chapter 310, Acts of Assembly 1938, Code Supp. Secs. 3145 (1)-3145 (24), inc.) hereinafter referred to as the 'act'.

"The Grounds of Attack are Briefly:

"1. The General Assembly is without power to create such Authority.

"2. The property of such Authority is not exempt from taxation under Virginia Constitution, Sec. 183.

"3. The purpose of the Authority is not a public purpose, and the taking of property by it is for a private use.

"4. Its bonds are bonds of the city and are illegal as in violation of Virginia Constitution, Sec. 127.

"5. The contract of the city with the Authority is illegal in that it undertakes to bind future members of the City Council in the exercise of their legislative functions contrary to Virginia Constitution, Sec. 185.

"6. The general question as to the validity of the entire 'Act'.

"The defendants file separate demurrers to the bill upon the ground that the 'Act' is constitutional, and that the acts and contracts complained of are pursuant thereto and in compliance therewith.

"The contentions will be disposed of in the order hereinafter designated.

"The court is greatly assisted by the able briefs filed by counsel which demonstrate careful consideration and investigation of the questions involved.

"Logical sequence calls for consideration, first, of two basic questions, which are covered by contentions '1' and '3' above. They are, first, the power of the Legislature to create the Housing Authority, and second, whether the property of the Authority is devoted to a public use. Naturally, if the Authority cannot lawfully be created, then that is decisive of the case. Likewise if it may be lawfully created, but may not condemn property for the reason that the property would be devoted to a private use, such Authority would be so hampered in its functions as to practically defeat its purpose.

"The consideration of these two questions involves consideration of the foundations of the police power and the power of eminent domain.

"It has been said, *West Bros. Brick Co.* v. *Alexandria,* 169 Va. 271 [192 S. E. 881], quoting from *Town of Windsor* v. *Whitney,* 95 Conn. 357, 111 A. 354, 356, 12 A. L. R. 669:

" 'The line between eminent domain and the police power is a hard one to hold with constancy and consistency, and

it is not surprising that now and again these two great powers of government have been confused.'

"Such confusion is probably due almost entirely to the fact that the object to be attained by the exercise of each fundamental power is the same, and the reason for the exercise of the power the same, that is, the public benefit. Such confusion will be avoided in this discussion by considering each separately; however, the similarity of reason and purpose will be apparent.

"It is contended that the power of the Legislature to create the Housing Authority may be sustained for several reasons: First, because it is a valid exercise of the police power; second, because embraced in the general legislative power without prohibition or restraint; and third, because specifically authorized by Virginia Constitution, Section 147.

"Let us consider these contentions in the above order, first as to the police power.

"The declared purpose of the Act is as follows, Code, Sec. 3145 (2):

" 'It is hereby declared: (A) that the clearance, replanning and reconstruction of the areas in which insanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired and are governmental functions of grave concern to the Commonwealth;—'

"The Act then proceeds in paragraph (3) to define a 'slum' and to define a 'housing project', among other provisions, as an undertaking to clear slum areas and provide decent, safe and sanitary living accommodations for persons of low income.

"It is therefore, to be seen that the Act has as its primary and avowed purpose the eradication of slums, and, in order to accomplish this, it attacks the situation from two angles; one, the elimination of existing slums, and, two, the establishment of modern standard living accommodations, an in-

separable incident to the accomplishment of the primary purpose.

"It is a matter of common knowledge that slum areas where many people gather under the lowest possible standards of living, crowded together in dilapidated hovels which are unsafe, unsanitary and unhealthful, in a sordid atmosphere, are the places where is bred, nurtured, and brought to its destructive fruition the greater percentage of crime and moral degeneracy; likewise that such are the breeding places from which disease is spread; and, worst of all, such places are self-perpetuating in that offsprings born under such conditions are damned, from the day of their arrival in this world, to the life of their fathers. Such gathering places of filth, lust, crime, disease and degeneracy are a tragic detriment not only to their inhabitants, but are in every respect a social and economic detriment to the people at large. Their eradication is a matter of vital concern to the public and to the State. That the existence of such situations is detrimental to the health, safety, morals, general welfare and general prosperity of the people is so clear as not to require any reasoning. That it is a subject for the exercise of the police power is equally clear.

"Thus, under well recognized principles, the Authority, to the extent that it is established for the purpose of eliminating slum areas, may be created under the police power of the State.

"It does not necessarily follow, however, that this is true as to the functions of the Authority in regard to erecting and maintaining low-rent projects, which proposition will be next examined.

"This question is not free from difficulty. It is presented by complainant in his brief in the form of the assertion—'That government interference or operation could be extended to almost every conceivable private enterprise if the only necessary reason for so doing were that (the) desired result, public health, could be more cheaply obtained for low income classes, by use of government funds and tax

exemption * * until we should have a completely socialized or communised state.'

 * * * * * * *

"It is true that this contention finds support in the opinion in *Ohio* v. *Helvering* [292 U. S. 360, 54 S. Ct. 725, 726], 78 L. Ed. 1307, where it is said:

" 'Nevertheless, the police power is and remains a governmental power, and applied to business activities is the power to regulate those activities, not to engage in carrying them on. *Rippe* v. *Becker*, 56 Minn. 100, 111, 112, 57 N. W. 331, 22 L. R. A. 857. If a state chooses to go into the business of buying and selling commodities, its right to do so may be conceded so far as the Federal Constitution is concerned, but the exercise of the right is not the performance of a governmental function, and must find its support in some authority apart from the police power.'

"However, the statement must be considered in connection with the issue involved in that case. There, the State of Ohio sought to enjoin the collectors of internal revenue for the United States from collecting federal liquor dealer's license taxes on State-owned liquor dispensaries. It was contended that the State, in operating the dispensaries, was engaging in a governmental function under its police power, and was not subject to Federal taxation in regard to its governmental functions. The court held that the State was engaging in a proprietary function and as such was taxable.

"In considering the effect of this holding, it must be remembered that the liquor traffic has long occupied a peculiar field, when compared to traffic in other commodities, and that the power not only to regulate but entirely prohibit the traffic has been generally accorded. See *State ex rel. George* v. *Aiken* [42 S. C. 222], 20 S. E. 221, 26 L. R. A. 345, and cases cited, including quotation at page 352 (L. R. A. report), from *Crowley* v. *Christensen*, 137 U. S. [86], 90 [11 S. Ct. 13], 34 L. Ed. [620], 623. The opinion in *State ex rel. George* v. *Aiken* is in conflict with *Ohio* v. *Helvering*, the former sustaining the constitutionality of a State dispensary law by holding that the operation of dispensaries

is incident to the regulation of the liquor traffic under the police power. In doing so it distinguishes the case of *Rippe* v. *Becker* (cited as authority in *Ohio* v. *Helvering*), declaring void an 'act to provide for the purchase of a site and for the erection of a State elevator at Duluth for public storage of grain' [42 S. C. 222, 20 S. E. 231], upon the difference that such statute was not aimed at a 'business dangerous to the health, morals and safety of the people.'

"Although State operation of a liquor dispensary may not be, for Federal tax purposes, an exercise of the police power, the reason of *Ohio* v. *Helvering* does not prevent State (or delegated) operation of low cost housing projects in furtherance of the elimination of slums. The supplying by the State of liquor, which might otherwise, with full authority, be declared entirely contraband, is entirely different from supplying wholesome living quarters in an effort to get rid of slum conditions which cannot be prohibited or legislated out of existence. There is a more direct connection between the primary purpose to be accomplished and the means employed to attain it in the latter instance than in the former. In the former it is a matter of enforcement expediency; in the latter it is a matter of prime necessity to the accomplishment of the fundamental purpose.

"There is nothing in the nature of the police power which precludes the idea that a State or a political subdivision thereof under authority from the State may, if necessary, enter into a business in order to effectuate a result properly coming within the scope of such sovereign power. The various holdings of the courts and statements of text-writers amply justify this statement. Some of those statements in regard to the police power follow:

"A quotation from Black on Intoxicating Liquors in *State ex rel. George* v. *Aiken* (*supra*) [42 S. C. 222, 20 S. E., page 225, 26 L. R. A.] page 352, thus states the power:

" 'It cannot be doubted, however, that the origin of this power must be sought in the very purpose and framework of organized society. It is fundamental and essential to government. It is a necessary and inherent attribute of

sovereignty. It antedates all laws, and may be thus described as the assumption on which constitutions rest; for the State * * must have the power to preserve its own existence in safety and prosperity, else it could neither fulfil the law of its being, nor discharge its duties to the individual. And to this end it is necessarily invested with power to enact such measures as are adopted to secure its own authority and peace, and preserve its constituent members in safety, health and morality. Theories of the State, according as they tend to enlarge or restrict the legitimate sphere of its functions and activities, will create theories as to the proper limitation of the police power.'

*"Barbier* v. *Connolly,* 113 U. S. 27 [5 S. Ct. 357], 28 L. Ed. 923, 924, quoted in the same case states thus:

" 'But neither the amendment (fourteen) broad and comprehensive as it is, nor any other amendment, was designed to interfere with the power of the State, sometimes termed its "police power" to prescribe regulations to promote the *health, peace, morals, education and good order of the people,* and to legislate so as to increase the industries of the State, *develop its resources, and add to its wealth and prosperity.'* (Italics supplied).

"In the 'Slaughter House Cases' *Butchers', etc.* v. *Crescent City, etc.,* 16 Wall. 36 [62], 21 L. Ed. [394] 395, it is said:

" 'This is called the police power; and it is declared by Chief Justice Shaw that it is much easier to perceive and realize the existence and sources of it than to mark its boundaries or prescribe limits to its exercise. *Com.* v. *Alger,* 7 Cush. [Mass. 53], 84.'

" 'This power is, and must be from its very nature, incapable of any very exact definition or limitation. Upon it depends the security of social order, the life and health of the citizens, *the comfort of an existence in a thickly populated community, the enjoyment of private and social life,* and the beneficial use of property. (Italics supplied).'

" 'It extends', says another eminent judge 'to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State;

* * and persons and property are subjected to all kinds of restraints and burdens in order to secure the general comfort, health and prosperity of the State—.'

"In *Gibbons* v. *Ogden* [9 Wheat. 1, 203, 6 L. Ed. 23], Chief Justice Marshall * * says: 'They form a portion of that immense mass of legislation which controls everything within the territory of a State not surrendered to the general government * * '

"Most timely observations have been made by the Supreme Court of Appeals of Virginia concerning the police power. In *Bowman* v. *State Entomologist*, 128 Va. 351, 361 [105 S. E. 141 [144], 12 A. L. R. 1121], sustaining the 'Cedar Rust Law', is the following:

" 'As said concerning the "police power" in *Lawton* v. *Steele*, 152 U. S. 133, 14 S. Ct. 499, 38 L. Ed. 385: "It is universally conceded to include everything essential to the public safety, health and morals *and to justify the destruction and abatement * * of whatever may be regarded as a public nuisance * * Beyond this, however, the State may interfere whenever the public interest demands * * " '* (Italics supplied).

"Again, in *West Bros. Brick Co.* v. *Alexandria*, 169 Va. 271, 282 [192 S. E. 881, 885], we find the following:

" 'In *Gorieb* v. *Fox, supra* [145 Va. 554, 134 S. E. 914], this court said:

" 'The Legislature may, in the exercise of the police power, restrict personal and property rights in the interest of public health, public safety and for the promotion of the general welfare." '

" 'This power "embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety." *Bacon* v. *Walker*, 204 U. S. 311, 27 S. Ct. 289, 291, 51 L. Ed. 499.'

" '*The power is not limited to regulations* designed to promote public health, public morals, or public safety, or to the suppression of what is offensive, disorderly or unestablishing such authorities by the Constitution of Virginia.

sanitary, *but extends to so dealing with conditions which exist as to bring out of them the greatest welfare of the people by* promoting public convenience or general prosperity.' *Wulfsohn* v. *Burden* (1925) 241 N. Y. 288, 150 N. E. 120, 122, 43 A. L. R. 651.

"In the same opinion, quoting further from *Gorieb* v. *Fox,* it is said [169 Va.] page 285 [192 S. E. page 887]:

" 'The extent of this power is difficult to define, but *it is elastic and expands automatically to protect the public against the improper use of private property to the injury of the public interest.'* (Italics supplied).

"The same thought is thus expressed in *Miller* v. *Board of Public Works* [195 Cal. 477], 234 P. 381 [383], 38 A. L. R. 1479, writ of error dismissed [273 U. S. 781, 47 S. Ct. 460], 71 L. Ed. 889:

" 'It is apparent that the police power is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expanding to meet existing conditions of modern life, and thereby keep pace with the social, economic, moral and intellectual evolution of the human race. * * There is nothing known to the law that keeps more in step with human progress than does the exercise of this power.'

"This quotation is taken from the note to 11 Am. Jur. 980, Const. L. Sec. 253, which also cites *Bowman* v. *State Entomologist (supra).*

"In a wide review, including the above authorities, the court has found no other statement concerning the scope of the 'police power' which would prevent the State or its political subdivision from entering into an enterprise, provided the other requisites for the exercise of the police power exist. On the contrary, in *Strawberry Hill Land Corp.* v. *Starbuck,* 124 Va. 71, page 78 [97 S. E. 362, page 364], upholding a statute authorizing the creation of drainage districts, the right to establish such districts was sustained under the police power, the court stating, p. 78:

" 'It is a governmental agency, an unincorporated community, organized for a specific and limited purpose *under the police power of the State.*' (Italics supplied).

"More will be said of this case later. In passing, reference might also be made to establishment of public irrigation projects in the western States under the police power, the establishment of national banks by Congress under the power incident to its granted powers (*McCulloch* v. *Maryland,* 4 Wheat. 316, 4 L. Ed. 579) and other instances.

"So the question resolves itself down to whether low cost housing projects come within these principles of the police power.

"The Legislature, by its enactment, has found in the affirmative.

"It is true that the Legislature may not act arbitrarily, and that its determination is not final, but subject to supervision by the courts, *Bowman* v. *State Entomologist, supra* [128 Va.] at pages 368, 369 [105 S. E. 141, at page 147, 12 A. L. R. 1121], and cases cited. But, as said in that case:

█ " 'However, as appears from the authorities just cited a large discretion is vested in the Legislature to determine what the interests of the public require, and also as to what is necessary for the protection of such interests and every possible presumption is to be indulged in favor of the validity of a statute.'

"See also, *State ex rel. George* v. *Aiken* (*supra*) ; *Allydon Realty Corp.* v. *Holyoke Housing Authority* (Mass.), 23 N. E. (2d) 665; *Chapman* v. *Huntington Housing Authority* (W. Va.), 3 S. E. (2d) 502, 509, and cases cited; *Danville* v. *Hatcher,* 101 Va. 523, 529 [44 S. E. 723].

█ "There is nothing in the pleadings to suggest that the Legislature has acted arbitrarily or unreasonably. Its enactment must be sustained unless—'It is clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare', *West Bros. Brick Co.* v. *Alexandria* (*supra*) ; *Euclid* v. *Ambler Realty Co.* [272 U. S. 365, 47 S. Ct. 114], 71 L. Ed. 303 [54 A. L. R. 1016] ; *Gorieb* v. *Fox* [274 U. S. 603, 47 S. Ct. 675], 71

L. Ed. 1228, 53 A. L. R. 1210. The evil sought to be remedied is a well known and recognized one, and, although the present method of attack may be novel, it is justified under established principles. These principles were designed to fit just such situations. As said in *Bowman* v. *State Entomologist* (supra). 'General welfare can no more be defined than can police power. These are terms which take on new definitions when we come to face new conditions.' Since the legislative finding is not arbitrary or unreasonable, but has a substantial relation to the public health, safety, morals and general welfare, it must be sustained. *West Bros. Brick Co.* v. *Alexandria,* 169 Va. 271, 288 [192 S. E. 881, 888], quoting *Martin* v. *Danville,* 148 Va. 247 [138 S. E. 629], to the following effect:

" 'It is a settled rule of the Supreme Court of the United States, if the question of reasonableness is fairly debatable, to hold that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of deciding the question.'

"Neither is the wisdom of the enactment a matter for the court, *Danville* v. *Hatcher,* 101 Va. 523 [44 S. E. 723]. 'Courts cannot run a race of opinions upon points of right, reason and expediency with the law making powers, Id. [101 Va.] page 534 [44 S. E. page 727].'

" 'The best indications of public policy are to be found in the enactments of the Legislature,' *Danville* v. *Hatcher* (*supra*) [101 Va.] page 532 [44 S. E. page 726], and 'Courts take cognizance of public and social developments and balance them as best they can against private rights.' *West Bros. Brick Co.* v. *Alexandria* (*supra*) [169 Va.] page 281 [192 S. E. page 885].

"So the Legislature may, under the police power (which 'shall never be abridged,' Va. Const., Sec. 159), establish housing authorities unless otherwise inhibited by the fundamental law.

"Next, the Legislature is not prevented from

This Constitution is a limitation and restriction of powers rather than a grant of powers, *Richmond* v. *Virginia Ry. & P. Co.,* 141 Va. 69, 91 [126 S. E. 353] ; *Strawberry Hill Land Corp.* v. *Starbuck,* 124 Va. 71, 77 [97 S. E. 362], and case cited. Full search reveals that there is nothing therein contained which limits or restricts the power to create such a State agency and designate it as a political subdivision of the Commonwealth. To like effect was the holding in *Strawberry Hill Land Corp.* v. *Starbuck* (*supra*), where it is said, page 76 [of 124 Va., page 364 of 97 S. E.] :

" 'It has been said that the exact status of such districts is an academic question: Certainly it is not necessary to define it with precision. Such districts have been denominated public; or quasi public corporations, quasi municipal corporations; and it is also said that they are not corporations at all, but merely governmental agencies for the administration of a legislative power. It has been held that a constitutional power expressly granted to the Legislature to organize various specified municipal and quasi municipal corporations not including drainage districts, does not preclude the organization of such districts; and that town officers performing duties imposed upon them in connection with the administration of a drainage district, act as representatives of the State and not of the town.'

"Not only is all specific restriction absent, but on the contrary there is a general grant by Section 63, providing that 'the authority of the General Assembly shall extend to all subjects of legislation not herein forbidden or restricted.'

" 'It would seem further that the power is specifically granted by Section 147 providing: "Such public welfare, charitable, sanitary, benevolent, reformatory or penal institutions as the claims of humanity and the public good may require shall be established and operated by the Commonwealth under such organization and in such manner as the General Assembly may prescribe." '

"The purposes of a housing authority under the act appear to meet fully the classification of 'charitable, sanitary

and benevolent' institutions established for the 'public welfare.'

"Therefore the contention of defendants is sustained as to all three bases of the legislative power to establish housing authorities.

"As an incident to this question, there is drawn in issue the right to delegate to the city the authority to determine when the Housing Authority created for that locality shall become operative, the authority of the mayor to appoint its commissioners and the legality of the organization of the Bristol Authority.

"As will be seen from the act, Section 4, the General Assembly has, itself, created a housing authority for each city and county. It remains in a dormant state until brought into action by the local governing body. Therefore, the Authority is already in existence in each locality, with the option in the local governing body to start it functioning or not. Since the Legislature has the authority to create it, it has the authority to determine when it shall act. It has, by the act, delegated this authority to the local governing body. The authorities are overwhelming that this is a valid delegation of legislative authority, *Bowman* v. *State Entomologist,* 128 Va. 351, 375, 379, where the following appears at page 375 [105 S. E. 141, at page 149, 12 A. L. R. 1121]:

" 'This position * * loses sight of the consideration that such clause ("equal protection") permits of a wide scope of discretion on the part of the Legislature in classification in the adoption of police laws, and also leaves out of consideration the well understood legislative local option power, so to speak, of permitting localities which may be affected by a police regulation to accept or reject it by vote of the people, *or by action of officials of the locality,* where a statute is by its terms thus conditioned in its application.' (Italics supplied).

"In the *Bowman Case* the 'cedar rust' law, which was upheld, was left, for its application, to the will of the board

of supervisors, or of the qualified voters under the terms set forth in the statute.

"See also, *Danville* v. *Hatcher,* 101 Va. 523, 530 [44 S. E. 723, 726], where it is said:

"'In the absence of constitutional restrictions, it is competent for the Legislature to confer its police power upon municipal corporations in such measure as it deems expedient. It cannot of course, bestow greater power than the State itself possesses, and it must keep within the organic law. Subject to these restraints, it is within the province of the Legislature to invest such corporations with the police power of the State in whole or in part.'

"Upon the same subject, see also, *Ex parte Bassitt,* 90 Va. 679, 682 [19 S. E. 453]; *Ould* v. *Richmond,* 23 Gratt. (64 Va.) 464, 467 [14 Am. Rep. 139]; *Strawberry Hill Land Corp.* v. *Starbuck,* 124 Va. 71, 76 [97 S. E. 362]; *Kirkpatrick* v. *Board of Supervisors,* 146 Va. 113, 126, 127 [136 S. E. 186], and cases there cited.

"Having the power, therefore, to delegate this legislative authority to the locality, then the action of the local body is governed by the same principles as have been referred to in sustaining the legislative finding.

"Again, there is no issue of fact raised by the pleadings in this case as to the correctness of the finding of the Council of Bristol, Va., but only an issue of law as to its authority to act. As shown, the Legislature does have the power to authorize it, and the act in specific terms does authorize it. Consequently, the action of the council in passing the resolution, the action of the Mayor in appointing commissioners and the legality of the organization of the Bristol Housing Authority must all be sustained.

"The next question is whether the property of the authority is devoted to public use, so as to support the right of eminent domain.

"It is true that the 'Act' declares that its purposes are 'public uses and purposes for which public money may be spent and private property acquired', Sec. 3145 (2).

448

It is also true that Virginia Constitution, Sec. 58, provides 'the term "public uses" is to be defined by the General Assembly. However the power to define is not the power to declare, and the declaration is not conclusive. The Legislature has fulfilled its duty to define by the passage of Code, Sec. 3030b. Consequently the question still remains a judicial one, as said in *Light* v. *Danville,* 168 Va. 181, 208 [190 S. E. 276, 287], 'This court has consistently held that whether a condemnation is for a public or a private use, it is a judicial question and is subject to the review of the courts', citing *State Highway Com'r* v. *Kreger,* 128 Va. 203 [105 S. E. 217], and *Nichols* v. *Central Virginia Power Co.,* 143 Va. 405 [130 S. E. 764, 44 A. L. R. 727]. So, it is incumbent upon the court to inquire into this question.

"The nature and purpose of a housing authority have already been discussed; it only remains to examine them in the light of established principles.

"The opinion in *Light* v. *City of Danville,* 168 Va. 181 [190 S. E. 276, 284], dealing with what is a public use reads as follows:

" 'Justice Campbell said in *Nichols* v. *Central Virginia Power Co.,* 143 Va. 405, 130 S. E. 764, 44 A. L. R. 727, in approving the able and comprehensive opinion of Judge Cardwell in *Fallsburg, etc. Co.* v. *Alexander,* 101 Va. 98, 43 S. E. 194, 61 L. R. A. 129, 99 Am. St. Rep. 855:

" 'A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of its enjoyment must be within the control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of property cannot be said to be public if it can be gainsaid, denied or withdrawn by the owner. The public interest must dominate the private gain.

" 'The Virginia cases have consistently adopted the above theory of construction, *Miller* v. *Pulaski* (two cases), 109 Va. 137, 63 S. E. 880, 22 L. R. A. (N. S.) 552, and 114 Va. 85, 75 S. E. 767'—(and other cases there cited).

"The case again at page 206 [of 168 Va., page 286 of 190 S. E.], quotes Chief Justice Campbell in *Nichols* v. *Central Virginia Power Co.* as follows:

" 'It is difficult at times to observe the line of demarcation between private benefit and public use, when the two are thus so blended, the judicial practice in such cases is to approve the undertaking if it is capable of furthering the public use and disregard the private benefit as a mere incident.'

"In *Jeter* v. *Vinton-Roanoke Water Co.*, 114 Va. 769, 781 [76 S. E. 921, 926, Ann. Cas. 1914C, 1029], the court quotes the following:

" 'The reason of the case and the settled practice of free government must be our guides in determining what is or what is not to be regarded as a public use; and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare, which on account of their peculiar character and the difficulty, perhaps impossibility, of making provision for them otherwise it is alike proper, useful and needful for the government to provide.'

"In view of what has already been said concerning the purpose of the housing authority with reference to eradicating slums, and as an indispensable incident, the providing of decent homes, the court considers that the use of the property in the instant case is a public one.

"The fact that the project may primarily benefit only a class does not take away the character of a public use. *Bowman* v. *State Entomologist*, 128 Va. 351, 372 [105 S. E. 141, 12 A. L. R. 1121]; *Virginia Devel. Co.* v. *Crozier I. Co.*, 90 Va. 126, 128, 129 [17 S. E. 806, 44 Am. St. Rep. 893]; *Barbier* v. *Connelly*, 113 U. S. 27 [5 S. Ct. 357], 28 L. Ed. 923; *Strawberry Hill Land Corp.* v. *Starbuck, supra.*

"Complainant in paragraph 12 of his bill complains of the competition of the project with the property owned by him. This contention was disposed of in *Williamson* v. *Housing*

*Authority of Augusta,* 186 Ga. 673, 199 S. E. 43, 50, in the following language:

 " 'A like argument could be made by a property owner whenever the city takes over activities of the kind originally carried on by private enterprise. The suggestion * * is completely answered by * * [*Alabama Power Co.* v. *Ickes,* 302 U. S. 464, 58 S. Ct. 300, 304, 82 L. Ed. 374]. "The claim that petitioner will be injured, perhaps ruined, by the competition of municipalities brought about by the use of the moneys, therefore, presents a clear case of *damnum absque injuria.* Stated in other words, these municipalities have the right under State law to engage in business competition with petitioner, since it has been given no exclusive franchise. If its business be curtailed or destroyed by the operations of the municipalities, it will be by lawful competition from which no legal wrong results.'

 "Consequently, the taking of property is for a public use, and that portion of the act bestowing the power of eminent domain is constitutional and does not violate Section 58 of the State Constitution.

"We come now to consideration of whether that portion of the 'Act' exempting the property of an authority from taxation is constitutional.

"The Virginia Constitution, Sec. 183, by paragraph (a) exempts from taxation 'property owned directly or indirectly by the United States, the Commonwealth or any political subdivision thereof—'. The same section contains the further qualifying paragraph:

" 'Whenever any building or land, or part thereof, mentioned in this section and not belonging to the State, shall be leased or shall otherwise be a source of revenue or profit, all such buildings and land shall be liable to taxation as other land and buildings in the same county, city or town.'

 "Under the Act, Secs. 3145 (3) (a), 3145 (4) and 3145 (8), a housing authority is created as a 'political subdivision' of the Commonwealth. Therefore its property is exempt from taxation under paragraph (a) unless it should be leased or otherwise be a source of revenue or profit. 'Rev-

enue' has been construed to mean 'net revenue', *City of Newport News* v. *Warwick County,* 159 Va. 571, 594 [166 S. E. 570, 167 S. E. 583]; and under the act Sec. 3145 (9), an authority is by law restrained from operating for profit or as a source of revenue. Thus the authority cannot bring itself within the constitutional exception subjecting its property to taxation, without violating the statute creating it. It is therefore concluded that the property of the Authority is exempt from taxation, and the portion of the contract between the City of Bristol and the Authority, exempting the property of the latter from taxation is nothing more than a recognition of the constitutional exemption.

. "The next ground of attack to be considered is number 4 under which it is contended that the bonds of the authority are bonds of the city and are illegal as in violation of Virginia Constitution, Sec. 127.

"As ably reviewed by counsel for the Housing Authority in its brief the way in which the city may issue bonds is specifically prescribed by law, and in that way, and that way only, can valid and binding obligations of the city be issued. Charter of Bristol, Va., Sec. 42 (a), 42 (n), (k); Code of Va. Sec. 3079-3090. Bonds issued under the 'housing authorities law' would upon their face, have no semblance of purporting to be bonds of the city. In addition, the language of the Act on the question is unmistakably plain. Section 14 provides:

" 'The bonds and other obligations of an authority (and such bonds and obligations shall so state on their face) shall not be a debt of the city, the county, the State or any political subdivision thereof (other than the authority) and neither the city or the county, nor the State or any political subdivision thereof (other than the authority) shall be liable thereon, nor in any event shall such bonds or obligations be payable out of any funds or properties other than those of said authority. The bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction.'

"As stated by counsel for the Authority in his brief (in referring to all of the statutory and charter provisions) 'In no other manner may the city be bound by the issuance of bonds, and all who purchase are bound by these provisions and limitations of authority and power.'

"Consequently the contention of complainant in this respect must fail.

"Next it is contended that the contract of the city with the authority is invalid in that it undertakes to bind future members of the City Council in the exercise of their legislative functions.

"Specific attention is directed, in complainant's brief to Sections 10, 11, 12 and 13 of the Cooperation agreement. The objection urged is that these provisions constitute an attempt 'to barter away, surrender and abdicate, the powers granted to it by law.'

"As previously noted, it is provided in the Constitution of Virginia, that the 'police power' shall never be abridged.

"Upon judicial determination, the principle is stated thus in Cooley's Constitutional Limitation (7th Ed.) p. 400:

" 'It would seem, therefore, to be the prevailing opinion, and one based upon sound reason, that the State cannot barter away, or in any manner abridge or weaken, any of those essential powers which are inherent in all governments, and the exercise of which in full vigor is important to the well-being of organized society, and that contracts to that end are void upon general principles, and cannot be saved from invalidity by the provision of the National Constitution now under consideration' (against passing any law impairing the obligation of contracts).

"For further statements of the principles, see *Stone* v. *Mississippi* [101 U. S. 814], 25 L. Ed. 1079; *New Orleans Gas Light Co.* v. *Drainage Commission* [197 U. S. 453, 25 S. Ct. 471], 49 L. Ed. 831; 11 Am. Jur. 983, Sec. 254.

" 'These principles apply to the police power delegated to municipal corporations. Thus, the general police power possessed by a city is a continuing power, and is one

of which a city cannot divest itself, by contract or otherwise.' 11 Am. Jur. 986, Sec. 254, note 5.

"Under these principles it must be determined what portions if any, of the paragraphs from the Cooperation Agreement deal with the police power or legislative power, and, if any be so found, whether they barter away or surrender that power.

"That portion of paragraph 10 which deals with taxes and assessments has already been mentioned in another connection, and it is sufficient to say here that the terms of the contract are no more than an acknowledgment of the legal right of the authority to such exemption. That portion which deals with furnishing municipal facilities gives no greater right to the Authority than is enjoyed by citizens in general. Maintaining the public facilities is a ministerial functon, and therefore subject to contract.

" 'The duty of a municipal corporation to see that its streets and sidewalks are in a safe condition; and that its sewers and drains are kept in good order, and that its other like municipal obligations are cared for, is a purely ministerial and absolute corporate duty.' *Terry* v. *Richmond,* 94 Va. 537, 545, 546 [27 S. E. 429, 431, 38 L. R. A. 834].

"There is, in this paragraph, no surrender of the police power, or binding of future councils upon legislative matters.

"Paragraph 11 deals with zoning, which has been sustained *because it is* a valid exercise of the police power. *West Bros. Brick Co.* v. *Alexandria,* 169 Va. 271 [192 S. E. 881].

"However, the terms of that paragraph applying to zoning are so drawn as not to hamper the discretion of future councils. It only agrees to zone or rezone to *an appropriate site and neighborhood classification.* Such would be the duty of the Council under the law in any zoning ordinance adopted. Code, Sec. 3091 (1)-3091 (26). Sec. 3091· (3), in part, provides that the zoning plan shall be made 'with a view to conserving the value of buildings and encouraging the most appropriate use of land.' By order of Sept. 12,

1939, this court appointed a zoning commission under Sec. 3091 (6) pursuant to resolution of the City Council.

"By the second sentence of paragraph 11 the city 'agrees that without charge to the Authority, it will vacate and close any streets, roads, roadways, alleys, sidewalks or other places *(which the Authority finds are reasonably necessary* in the development of the project) located in the area of said project *or adjacent thereto.'* (Italics supplied.)

 "The court is unable to find any basis upon which the validity of this sentence may be founded. It clearly, if sustained, places beyond the control of the local legislative representatives of the people, the determination of matters directly and vitally affecting the public safety. The location of public ways is purely a legislative function.

" *'A corporation acts judicially in selecting and adopting a plan on which a public work shall be constructed; yet as soon as it begins to carry out that plan, it acts ministerially and is bound to see that it is done in a reasonably safe and skillful manner.'* Jones v. *Richmond,* 118 Va. 612, 619 [88 S. E. 82, 83].

"The same case at page 619 [of 118 Va., at page 83 of 88 S. E.] quoting Judge Riely in *Jones* v. *Williamsburg,* says:

" 'The defendant was empowered by its charter to lay off streets and walks and improve the same, but it was wholly within its discretion when and where it would do so. For the omission to exercise the power, *it being legislative and discretionary,* it would not be liable.' (Italics supplied).

"It has been said that the test of the validity of an act is not what has been done under it, but what may be done. In the instant case, should the Authority see fit to close Myrtle street, which borders the white project, and which is a part of the Lee highway, or to close Mary street, which passes through this project, and is a much traveled and convenient concrete street, the city would be required to do so. To thus illustrate the extent of the power given by the contract is to demonstrate its invalidity in this respect.

 "The remaining provisions of paragraph 11 are found unobjectionable because they are thus conditioned:

'So far as is possible to require removal thereof and without unusual expense or inconvenience.' This provision safeguards the legislative discretion.

"That portion of paragraph 12 which binds the city to accept such land as the Authority determines to be reasonably necessary for streets and alleys is invalid for the same reasons stated in dealing with the second sentence of paragraph 11. The general power of cities over streets therein is conferred by Code, Sec. 3030. The Housing Authority is created for a specific purpose, and there is not enumerated among its powers the right to determine the location of the city's streets. It therefore has no legislative powers in that respect. It is simply inconsistent with the fundamental concepts of a city as a municipal corporation to say that another political subdivision located within its bounds may dictate as to when and where it shall open, close, pave and otherwise deal with public ways within that city. The statute does not contemplate that such authority or the city shall so deal with the police power of the city. The remainder of paragraph 12 is unobjectionable as it is, in substance, no more than an acknowledgment of the rights which any landowner retains by law, upon the dedication of streets, Code, Sec. 5219.

"Again in regard to paragraph 13, if it imposes an unconditional obligation upon the city, it would be invalid for reasons already stated. However, that paragraph provides that 'such facilities shall be furnished and such work performed * * after arrangements have been made for financing * * in such manner as may be agreed upon by the city and the Authority.' Thus it is seen that the obligation is conditioned upon the city agreeing upon the necessary financial arrangements, thereby preserving the legislative discretion of the Council. No other specific grounds of attack upon the agreement are set forth, and there is apparently no basis for further objections.

"The last ground of attack is that which attacks the validity of the Act in general, and asks a declaratory judgment as to the validity and interpretations of the act, ordi-

nance and contracts in question. No specific questions, other than those already passed upon are raised; consequently the foregoing opinion disposes of the case; except that there is one remaining question which is incident to the question of public use, and which it is necessary to discuss. The act, in paragraph 8 (d) confers upon the Authority the power 'to sell * * transfer * * or dispose of any real * * property or any interest therein.' Again in paragraph 14 authorizing the issuance of bonds and securing the payment of same, an authority may 'mortgage * * any housing project, projects * * of the authority.' Still further in paragraph 16 (b) is conferred the power to 'mortgage all or any part of its real * * property then owned or thereafter acquired.' Then in paragraph 10 relating to rentals and tenant selection it is provided that 'nothing in this or the preceding section' (operating not for profit) 'shall be construed as limiting the power of an authority to vest in an obligee the right, in the event of default by the authority, to take possession of a housing project or cause the appointment of a receiver thereof, free from all the restrictions imposed by this or the preceding section.'

"Are these provisions invalid as empowering the Authority to defeat the public use of its property? It is thought that they do not. We are dealing here with a political subdivision which has no power to tax, and whose only sources of credit are its property and contributions to it. It therefore becomes necessary that it be empowered to mortgage its property in order to secure the funds with which to carry out its purposes. The nearest similar cases are those where municipal corporations, water commissioners, and other public agencies have been held to be authorized to mortgage public property to secure bonds. For a collection of these cases see note in 39 A. L. R. beginning at page 216.

"If these provisions of the act under consideration are invalid, the reason is not that the Legislature does not possess the ultimate power to direct the disposition of public property, *Cooley's Const. Lim.*, p. 342, but because even

the Legislature in dealing with property impressed with a public trust must safeguard the rights of the beneficiaries of that trust, which may be doubtful in the present instance.

 "A doubt, however, is insufficient, and all doubt must be solved in favor of the constitutionality of the enactment.

"Acordingly the demurrers to all portions of the bill which in any manner assail the validity of the Housing Authorities Law will be sustained.

"The question of the constitutionality of State housing authorities laws has been passed upon by a number of courts. Most of these cases are collected in a footnote by the court to *Allydon Realty Corp.* v. *Holyoke Housing Authority* (Mass.), 23 N. E. (2d) 665, 669, and a more recent tabulation in *Humphery* v. *City of Phoenix et al.* (Ariz.), 102 P. (2d) 82, decided May 6, 1940. In all cases, so far as the court has been able to ascertain, such laws have been upheld."

*Affirmed.*