# CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH

City of Virginia Beach

v.

Christopoulos Family, L.C.

August 10, 2000

Case No. (Law) CL99-2811

BY JUDGE H. THOMAS PADRICK, JR.

This matter arises from a condemnation proceeding wherein the City of Virginia Beach (hereinafter, the City) seeks to take property owned by Christopoulos Family, L.C. (hereinafter, the landowner) for use as a parking garage (a.k.a. "the North Parking Garage") through its power of eminent domain.

The City, the Virginia Beach Development Authority (hereinafter, the Authority), and Thirty First Street, L.C. (hereinafter, the developer) entered into a contract for development of oceanfront property already owned by the Authority to build a four-star hotel complex and accompanying park.

Pursuant to this agreement, the City ultimately committed to use its powers of eminent domain to obtain property needed for a parking garage for use by the hotel complex and the public at large. The landowner contests the validity of the City's actions arguing the City acted *ultra vires* and citing the Dillon Rule in support. In short, the defendant claims the City exceeded its statutory authority to condemn property. The City contends it has the power to condemn property for public use and the parking garage serves a public purpose. Furthermore, the City argues the issues raised by the landowner cannot properly be raised in a condemnation proceeding. Both parties move for summary judgment. The parties concede that the facts are not in dispute.

The first issue confronted by the Court involves the question of whether the landowner may contest the validity and authority of the City's actions in a condemnation proceeding. The City argues these issues are collateral to the condemnation. It has been held on repeated occasions that whether a taking under eminent domain is for public use, as well as the municipality's authority to condemn, fall within the realm of judicial determination and may properly be raised in a condemnation action. See *Board of Supervisors of Prince William County v. Board of Supervisors of Fairfax County*, 206 Va. 730, 735, 146 S.E.2d 234, 238 (1966) (the court determined issues regarding the county's authority to condemn, whether public use was the purpose of the taking, and whether the county followed the requirements set forth in the eminent domain statutes in a condemnation action); see also *City of Richmond v. Dervishian*, 190 Va. 398, 416, 57 S.E.2d 120, 129 (1950) (the court found landowner's defense of the invalidity of the city's taking proper although the general condemnation statutes do not expressly provide for such defense); *Stanpark Realty Corp. v. City of Norfolk*, 199 Va. 716, 718-21, 101 S.E.2d 527, 530-31 (1958) (the court reviewed issues of the city's authority to condemn and whether the taking was for a public purpose in a condemnation proceeding). In *Light v. City of Danville*, the court gave a precise description of proper defenses and their limits raised in a condemnation proceeding as thus:

A defendant may attack on the grounds of lack of constitutional capacity to exercise the power. He may show that the statute conferring the power has not been strictly followed in procedure. He may show any fact tending to prove that the exercise of power is unauthorized, that the land is not being taken for public use, or that he has not been allowed a just compensation ascertained according to law.

On the other hand, a condemnation proceeding is not subject to collateral attack upon the question of the wisdom of construction of a public improvement, or the means, or the manner in which such improvement is to be constructed, or the economic soundness of the proposition. The decision of such questions lies within the judgment of the agency proposing to enter into and effectuate the public purpose.

168 Va. 181, 196, 190 S.E. 276, 282 (1937). In the present case, the landowner does not contest the City's economic reasoning behind its contract with the developer and the Authority. Nor does the landowner question how

the project will be constructed. Rather, the landowner contests the City's authority to enter into a contract with a third party and its use of eminent domain powers to greatly benefit private development. The Court finds the landowner's defense proper because it contests the validity and authority of the taking, not the economic or structural feasibility of the project.

The Court, however, does not find merit in the landowner's contention that the City's actions are arbitrary and capricious as a matter of law because they ignore the advisory referendum held by the City on May 2, 2000. The referendum does not obligate the City to conform its actions to the results. The referendum merely advises the City of the voters' preference.

The next issue presented to the Court involves a determination of the breadth of the City's statutory authority to condemn. When determining the scope of local government authority, Virginia courts adhere to the Dillon Rule:

> The Dillon Rule of strict construction controls our determination of the powers of local governing bodies. This rule provides that municipal corporations have only those powers that are expressly granted, those necessarily or fairly implied from expressly granted powers, and those that are essential and indispensable.

*City of Chesapeake v. Gardner Enterprises*, 253 Va. 243, 246, 482 S.E.2d 812, 814 (1997). This rule further requires any reasonable doubt as to whether a municipality has certain authority to be construed against the locality. See *City of Richmond v. Confrere Club of Richmond, Va., Inc.*, 239 Va. 77, 79-80, 387 S.E.2d 471, 473 (1990).

The power of eminent domain is totally statutory. Virginia Code § 15.2-1901 confers the power of eminent domain upon a locality when authorized to acquire real property for public use. Virginia Code § 15.2-967 allows a locality to provide parking facilities to the public. These statutes, read together, as well as the resolution adopted by City Council approving the City's acquisition of property for public parking, clearly gives the City the power to condemn property for public parking facilities. The question then becomes whether the City can enter into a contract with a private entity in which it resigns itself to exercise eminent domain powers to provide parking for the private entity and for the public at large. In this case, can a private landowner enter into a contract with the City which results in condemnation of its neighbor's property?

Using the Dillon Rule of strict construction to analyze the above outlined scenario, the City has no express grant of authority to enter into a private contract of the sort at issue. The Virginia General Assembly considered a bill

in 1993 defining public use for condemnation purposes as economic development necessary to the public welfare. S.B. 251, 1993 Sess. (1993). This legislation failed. Its failure suggests the legislature did not intend to allow a city to condemn property solely for its economic benefit and development. Therefore, the Court must determine whether the City's power of condemnation for public use also implies the power to enter into a contract with a private landowner in which the City agrees to acquire neighboring private property to benefit the private landowner. The Virginia Supreme Court explained the analysis appropriate for determining powers implied from express grants of authority:

> In questions of implied power, the answer is to be found in the legislative intent. To imply a particular power from a power expressly granted, it must be found that the legislature intended that the grant of the express also would confer the implied.
>
> In determining legislative intent, the rule is clear that where a power is conferred and the mode of its execution is specified, no other method may be selected; any other means would be contrary to legislative intent and, therefore, unreasonable. A necessary corollary is that where a grant of power is silent upon its mode of execution, a method of exercise clearly contrary to legislative intent, or inappropriate to the ends sought to be accomplished by the grant, also would be unreasonable.
>
> Consistent with the necessity to uphold legislative intent, the doctrine of implied powers should never be applied to create a power that does not exist or to expand an existing power beyond rational limits. Always, the test in application of the doctrine is reasonableness, in which concern for what is necessary to promote the public interest is a key element.

*Commonwealth v. County Bd. of Arlington*, 217 Va. 558, 577, 232 S.E.2d 30, 42 (1997) (citations omitted). The means or mode by which the City may exercise its power of eminent domain is specifically prescribed by the General Assembly in Virginia Code § 15.2-1903. This section requires adoption of a resolution approving the public use, directing the acquisition of the property, and explaining its use and necessity.

The resolution adopted by the City does approve the City's condemnation of property for use as a public parking facility. However, the ordinance does not address the City's power to enter into a contract with a private entity to provide parking to the entity as well as the public. Using the analysis outlined

above, the City may not select another method to acquire property other than that prescribed in the statute. The City, however, used the method described in the statute by adopting an appropriate resolution. It also went beyond that method by entering into a contract which resulted in condemning property for use by a private entity as well as the public. The Court must decide whether this expansion is contrary to legislative intent or inappropriate to the ends sought. Further, the Court must decide whether this expansion expands the City's power of eminent domain beyond rational limits. "The statutes confirming the power [of eminent domain] are to be strictly construed, and the authority conferred thereby is required to be carefully exercised." *Light v. City of Danville*, 168 Va. 181, 196, 190 S.E. 276, 281 (alteration in original).

The Virginia Supreme Court addressed a similar issue when deciding whether the City of Chesapeake could amend its zoning ordinance to prohibit construction of additional buildings or structures to support a nonconforming use. See *City of Chesapeake v. Gardner Enterprises*, 253 Va. 243, 245, 482 S.E.2d 812, 813 (1997). A landowner contested the validity of the city's amendment because the pertinent Code provision authorized the city to limit nonconforming uses of buildings, not nonconforming uses of land (as limited in the amended ordinance). The court considered the intent of the Code provision holding, "The statute must be given a rational interpretation consistent with its purposes, and not one which will substantially defeat its objectives" *Id.* at 247, 482 S.E.2d at 815. The court upheld the city's amendment because the purpose of the statute was to, "preserve rights in existing lawful buildings and uses of land, subject to the rule that public policy favors the elimination of nonconforming uses." *Id.* at 248, 482 S.E.2d at 815. Conversely, the situation at issue in this proceeding presents an extension of City authority which defeats the purpose of eminent domain powers conferred on localities by statute. The power of eminent domain authorizes the government's acquisition of private property for public use. Here, the City contracts with a private property owner to ultimately condemn neighboring property for the private property owner's use. The Virginia Supreme Court explained:

> [B]oth the Constitution of Virginia (§ 58) and the Constitution of the United States (Art. 5) forbid the taking of private property for public uses without just compensation, and "it has been universally held that the spirit of both constitutions is in conflict with the view that private property can be taken for private uses under any conditions or stipulations."

*Rudee Inlet Authority v. Bastian*, 206 Va. 906, 910, 147 S.E.2d 131, 135 (1966) (quoting *Boyd v. Ritter Lumber Co.*, 119 Va. 348, 351-352, 89 S.E. 273, 274 (1916)).

The contract entered into by the City, the Authority, and the developer, which has been filed herein, requires the City to acquire property for use by the hotel complex and the public. Virginia courts recognize that uses may benefit both the public and private sectors:

> It is difficult at times to observe the line of demarcation between private benefit and public use. When the two are thus so blended, "the judicial practice in such cases is to approve the undertaking if it is capable of furthering a public use, and disregard the private benefit as mere incident."

*Light v. Danville*, 168 Va. 181, 206, 190 S.E. 276, 286 (1937) (quoting *Nichols v. Central Va. Power Co.*, 143 Va. 405, 416, 130 S.E. 764, 767 (1925). However, the Court in Nichols further remarked:

> A use to be public must be fixed and definite. It must be one in which the public, as such, has an interest, and the terms and manner of enjoyment must be within control of the State, independent of the rights of the private owner of the property appropriated to the use. The use of the property cannot be said to be public if it can be gainsaid, denied, or withdrawn by the owner. *The public interest must dominate the private gain.*

*Nichols v. Central Va. Power Co.*, 143 Va. 405, 415-416, 130 S.E. 764, 767 (1925) (emphasis added) (quotation omitted).

In *City of Richmond v. Dervishian*, landowners challenged the city's taking of private land for public parking because the public parking would primarily benefit two department stores. The court held:

> The fact that property acquired to serve the public may also incidentally benefit some private individuals does not destroy the public character of the use. Nor are we concerned with the allegation in the bill and the argument in the brief that the city is "considering a proposal" to lease the property, after it has been acquired to a private corporation for operation at a profit, and that this will destroy its public use.

190 Va. 398, 407, 57 S.E.2d 120, 124 (citing *Mumpower v. Housing Auth.*, 176 Va. 426, 449, 11 S.E.2d 732, 741 (1940)).

The contract between the City, the Authority, and the developer evidences more than a proposal to lease property to a private entity. Rather, the City promises to acquire private land for the developer's benefit. The developer's use of the property is more than mere incident as shown by this Court's analysis of the contract in subsequent paragraphs.

In *Mumpower v. Housing Auth.*, the Virginia Supreme Court explained that a locality:

> cannot barter away, or in any manner abridge or weaken, any of those essential powers which are inherent in all governments, and the exercise of which in full vigor is important to the well-being of organized society, and that contracts to that end are void upon general principles, and cannot be saved from invalidity by the provision of the National Constitution now under consideration (against passing any law impairing the obligation of contracts).

176 Va. 426, 452, 11 S.E.2d 732, 742 (1940) (quotation omitted).

The court in *Mumpower* analyzed different paragraphs of a Cooperation Agreement between the city and the housing authority using the reasoning cited above. The court upheld a paragraph dealing with zoning because it was a valid exercise of municipal power and "the terms [were] so drawn as not to hamper the discretion of future councils." *Id.* at 453, 11 S.E.2d at 742-43 (quotation omitted). The court found the language only referenced an agreement to zone an appropriate site and council would have a duty to do such according to the law under any zoning ordinance. *Id.* at 453, 11 S.E.2d at 743. Conversely, the court held language in another paragraph requiring the city to approve land the housing authority deemed necessary for streets and alleys invalid. *Id.* at 455, 11 S.E.2d at 743. The court explained:

> It is simply inconsistent with the fundamental concepts of a city as a municipal corporation to say that another political subdivision located within its bounds may dictate as to when and where it shall open, close, pave and otherwise deal with public ways within that city. The statute does not contemplate that such authority or the city shall so deal with the police power of the city.

*Id.* at 455, 11 S.E.2d at 743. The court's reasoning emphasizes government control in the exercise of powers conferred upon it by law.

Another entity's (like the housing authority involved in *Mumpower*) control over local authority weakens the locality's sovereign power. Another example of the emphasis placed on control when determining whether property is being condemned for public use can be seen in the court's description of the public use test in *Dismal Swamp RR. v. John L. Roper Lumber Co.*:

> The controlling and decisive question is, have the public the right to its use upon the same terms as the person at whose instance the way was established? If they have, it is a public use; if they have not, it is a private one. If the owner can exercise the same kind of dominion over it as he does over other property owned by him, if he can close it up, if he can prohibit all, or any part, of the public from its use, then it is clear that its establishment would be private and not public; and the right of eminent domain could not be invoked in its creation.

114 Va. 537, 556, 77 S.E. 598, 605 (1913) (quotation omitted). To this end, the Court must determine whether the developer exercises control over the City's power of eminent domain in the contract.

The Court examined the agreement between the City, the Authority, and the developer and highlights, hereinafter, several portions:

> 1. *Negotiations to Acquire North Parking Garage Site.* City *shall commence and pursue* negotiations to acquire the North Parking Garage Site on the Effective Date. During the period prior to North Parking Garage Site Acquisition or North Parking Garage Site Failure, Developer shall not have the right to terminate this Agreement or the Escrow Agreement for any reason other than City or Authority's material default under this Agreement.

(Article II(B), p. 2.)

> 2. *Conditions to Construction Loan Closing.* Developer's *obligation to proceed* to Construction Loan Closing are subject to the satisfaction of the following conditions precedent:
> If required by Applicable Law, *City shall have executed an encroachment agreement or other agreement acceptable to the parties* allowing the construction and operation of the Walkway;
> Developer *shall have received evidence reasonably satisfactory to Developer* that City or Authority (whichever is appropriate) has

appropriated sufficient funds for the construction of the Parking Garage.

(Article XII(A)(1)(a), (b), (c), p. 30.)

3. *Post Construction Loan Closing Obligations.*

*Parking Garage.* The Parking Garage will be developed and constructed, or caused to be developed and constructed by City and/or Authority in a good and workmanlike manner *so that the exterior of the structure shall be similar to and compatible with the architectural design* of the Hotel.

The Parking Garage *shall include* approximately 26,000 square feet of shell space *available for retail development* if the North Parking Acquisition occurs. If North Parking Garage site Failure occurs, Developer and Authority shall cooperate to ensure that a reasonable number of square feet of shell space is available for retail development on the alternate Parking Garage Site, giving due regard to good planning and design of the Parking Garage, in accordance with the purposes of this Agreement. Developer shall have no obligation to bid on the retail space which is not substantially as shown on the original Master Plan.

The Walkway *will be constructed by City at its expense*, subject to appropriation of sufficient funds for such purpose *by the City Council*, as part of the Parking Garage.

Developer *shall have the right to review and comment* upon the plans for the construction of the Parking Garage (the "Parking Garage Plans") at three stages of design: at preliminary or schematic drawings; at design development drawings (approximately 55%); and at final construction drawings, prior to bidding. *City will provide* five complete copies of each set of drawings in a timely manner at each stage. Developer will have the right to review the floor plans, trolley stops, entrances and exits, consistency of exterior architectural design and treatments with the Hotel, the Walkway, signage specifically related to the Hotel and landscaping plans. . . . Authority's refusal to incorporate Developer's comments in whole or in part *shall be based on* (a) the material cost impact, individually or in combination, of Developer's comments; (b) the material delay, individually or in combination, caused by Developer's comments; (c) the inconsistency of Developer's comments with this Agreement, the Ground Lease, municipal regulations or applicable law; (d) the inconsistency of

Developer's comments with the Master Plan; or (e) the impact of the Developer's comments on Authority's ability to finance the Parking Garage.

The construction of the Parking Garage *shall be completed in accordance with the construction schedule* to be developed by the parties prior to the Construction Loan Closing Date, but *in no event later than the later to occur of (1) January 15 of the year following the Construction Year; or (2) the Hotel Completion Date.*

(Article XIII(D)(1)(a), (b), (c), (e), (f), pp. 38-39.)

4. The Parking Garage *will be operated* on the Parking Garage Site in accordance with the Ground Lease, which shall be consistent with the following principles:

The Parking Garage *will be open* 24 hours a day to Hotel guests and employees.

Developer *shall lease* 380 spaces (or that number required under applicable law to satisfy the parking needs of the Hotel, but not less than 380 spaces) for 65 years.

The rate charged to Developer for "excess parking" *will be* lesser of that rate charged to the general public for parking in the Parking Garage or the rate charged to residents of Virginia Beach for parking in the Parking Garage.

When the Parking Garage is at 100% occupancy for more than five hours per day for 60 days in any 12-month period of operation, *the City and/or Authority will, subject to appropriation of sufficient funds for the purpose by the City Council, proceed with the addition of one floor* (approximately 200 spaces) to the Parking Garage. This subsection shall apply only in the event that the North Parking Garage Site Acquisition occurs.

(Article XIII(D)(2)(a), (b), (c), (d), p. 40).

5. *Streetscapes*. Simultaneously with the construction of the Parking Garage, *City will construct, at City's expense*, as offsite improvements, the Streetscapes.

(Article XIII(E), p. 40.)

6. *Retail RFP*. On or before November 1 of the Planning Year. *City will endeavor* to issue a request for proposals (the "Retail RFP") to lease approximately 26,000 square feet of shell space in the Parking Garage (or, if North Parking Garage Failure occurs, and the Developer elects to proceed, the number of square feet of retail space which can be reasonably located on the first floor of the portion of the Parking Garage located on the Barracuda Bob's Site, giving due regard to good planning design of the Parking Garage consistent with the purposes of this Agreement), and *will endeavor* to select the winning proposal (the "Selected Retail Provider") submitted in response to the Retail RFP on or before November 1 of the Construction Year. The Retail RFP *shall require* that the RFP award be compatible with the operation of a full service Four Star Hotel, and shall contain a form lease for retail space. In addition, the Retail RFP *shall include* the Specified Retail Provisions.

If (i) Developer submits a proposal in response to the Retail RFP which contains an offer to lease that portion of the retail space located in the Parking Garage as shown on the Master Plan which is the lesser of (A) 26,000 square feet; or (B) either (1) if North Parking Garage Site Acquisition occurs, such retail space offered for rent; or (2) if North Parking Garage Site Failure occurs, such retail space offered for rent and shown as located on the Barracuda Bob's Site on the original Master Plan, in any event at a rate of at least $15.00 per square foot of retail space, Developer, or its permitted assigns under the Ground Lease, *shall be entitled to an annual rent credit* (the "Rent Credit") in an amount of $260,000, which begins on the Rent Commencement Date under the Ground Lease.

Developer *shall be entitled to the Rent Credit* only for a term which is the [sic] of (i) 25 years; or (ii) the average term of the offers to lease contained in Developer's proposals in response to the Retail RFP. Regardless of the preceding sentence, if the maximum term specified in the Retail RFP is less than 25 years and the term of Developer's proposals is equal to such maximum term so specified, *then Developer will be entitled to a credit for a term of 25 years*. The Rent Credit shall be applied first against Developer's obligations under the Ground Lease, second to Developer's rent obligations for supplemental spaces in the Parking Garage, and any excess shall be held in escrow by Authority pending future payments under the Ground Lease. *If City fails to issue the Retail RFP in accordance with the provisions of this Section, Developer shall be entitled to the full*

*annual Rent Credit of $260,000,* which begins upon the rent commencement date under the Ground Lease.

The retail space *shall include* customary mechanical, HVAC, and electrical systems, together with sub-flooring and sub-plumbing systems, ducting, and any other customary fit-outs in the Hampton Roads market.

(Article XIII(G)(1)(2)(3), pp. 41-42.)

7. *No Condominiums.* During the term of this Agreement, no portion of the Land may be owned, used, or converted to condominium, timeshare or similar ownership or use arrangement, *without the express written consent of the City Council.*

(Article XIII(H), p. 42.)

8. *Successors in Interest.* This Agreement *will be binding on and inure to the benefit of the parties and their respective successors and assigns*; provided, however, that prior to the date which is five years from the date the Hotel opens for business, the rights and obligations of Developer under this Agreement cannot be assigned by Developer without the prior written consent of the City and Authority, which will not be unreasonably withheld. Notwithstanding the foregoing, Developer may assign its rights and obligations under this agreement to an Affiliate and to an Acceptable Hotel Franchisor without the prior written consent of City and Authority.

(Article XVI(E), p. 53.)

9. *"Specified Retail Provisions"* means provisions substantially similar to the following provisions, as modified to include the definitions of the defined terms used therein:

All retail space constructed and occupied within the Parking Garage *shall be subject to the following use restrictions, which shall also be included in any offers to lease such space and any resulting leases and subleases*:

All businesses to be operated in the retail space *must be* compatible in nature with, and complimentary to, the construction and operation of the Hotel and any restaurants or nightclubs within the Hotel. The businesses *must not be* directly competitive to the

Restaurant to be constructed on the Restaurant Site or any restaurants or nightclubs operated in the Hotel. The businesses must be high quality retail and be compatible with a 300-room Four-Star Hotel.

The following uses and activities *shall be prohibited* in the retail space: (a) any use which emits or results in an obnoxious odor, noise or sound which would constitute a public or private nuisance (other than reasonable emanations of cooking odors from any restaurants otherwise permitted in the retail space); (b) any use that is physically damaging to other portions of the retail space or parking garage or that created dangerous hazards; (c) any laundromats; (d) any establishment selling or exhibiting pornographic material; (e) any flea-market; (f) any pool or billiard hall, other than the incidental use of pool or billiard tables for secondary entertainment purposes provided solely to customers; (g) any video, pinball and/or amusement arcade, or similar entertainment facility; (h) any motion picture theaters; (i) any business establishment with a drive-through window; (j) any tattoo or body piercing or body jewelry parlors or establishments; (k) any "head shops" or businesses selling items perceived as illegal substance trivia; (l) any businesses selling exclusively tourist souvenir items and/or soft drinks, beverages, snacks or candy for off-premises consumption; and (m) any horror or fright houses. This paragraph is intended only to set forth *certain specifically prohibited uses* and is in no way intended to limit the other conditions or restrictions contained herein.

(Appendix I, pp. 18-19.)

10. *"Streetscapes"* means the above-ground aesthetic improvements (sidewalks, roadways, lighting and upgraded landscape), consistent with agreed upon plans, that constitute the new "gateway level" streetscapes *for the following street areas: the north side of 30th Street between Atlantic and Pacific, the south side of 31st Street between Atlantic and Pacific, and both sides of Atlantic Avenue between 30th and 31st Streets, such that the Streetscapes will differentiate this area from other oceanfront sectors through the utilization of finish materials that will complement those roadways, landscapes, and sidewalks utilized by the Hotel and Restaurant Guests.*

(Appendix I, p. 19.)

11. *"Walkway"* *means an overhead walkway over Atlantic Avenue* connecting the Parking Garage and the Park Site, which walkway is *to provide access to the Hotel* and is to be *constructed by City at its expense as a part of the Parking Garage.*

(Appendix I, p. 20.)

Borrowing the language describing a public use in *Nichols,* the Court finds the contract divests the City of control over "the terms and manner of enjoyment . . . independent of the rights of the private owner appropriated to the use." 143 Va. 405, 415-16, 130 S.E. 764, 767. Further, the contract makes clear that the public's right of use does not dominate the private benefit. In fact, the agreement evidences the opposite intent. The developer's use of the property exceeds incidental benefit because the developer dictates how the City will exercise its power over a public parking garage situated on land condemned for the public use. This intent, in conjunction with the Dillon's rule requirement that reasonable doubt should be construed against the government and the fact that no statute confers upon the City the express or implied power to exercise eminent domain in a private contract, the Court finds the City acted *ultra vires* and beyond its statutory authority to condemn. Consequently, the City's Motion for Summary Judgment is denied and the landowner's Motion for Summary Judgment is granted. The Second Amended Petition for Condemnation is dismissed.